[No. S010723. Aug. 26, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
NOEL JACKSON, Defendant and Appellant.

1176

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Stephen Matchett and Susan Ten Kwan, Deputy State Public Defenders, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, William M. Wood and Laura Whitcomb Halgren, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant Noel Jackson was found guilty of the murder of Sonja Niles, as well as guilty of conspiracy to commit murder. The jury found true enhancements of his sentence for the possession and use of a

firearm. (Pen. Code, §§ 12022, subd. (a); 12022.5.)[1] It also found true one special circumstance—that "[t]he murder was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) At the penalty phase, it fixed defendant's sentence at death. The trial court sentenced defendant accordingly. This appeal is automatic under section 1239, subdivision (b).

We conclude that the judgment should be affirmed in its entirety.

## I. STATEMENT OF FACTS

### A. *Guilt Phase*

Defendant was tried with codefendant Michael Niles before two separate juries. According to the testimony of Anthony Piper, Niles, an old friend, contacted Piper on December 13, 1984. Niles told Piper that he wanted to have his wife killed and that he would be willing to pay $5,000 to the person who would accomplish that task. Niles said he wanted her murdered because she had "messed with him when he was playing basketball" (Niles had been a college and, briefly, professional basketball player) and that she had "sent his brother to prison." Piper asked Niles where he would get $5,000 and Niles replied that his wife had an insurance policy for $100,000. He would pay the murderer from the proceeds of the policy after it was cashed in. Piper stated that he was not interested. Niles offered to pay Piper $500 if he knew someone who would undertake the murder. Piper said he did not know any "hit men." Eventually Piper and Niles rode around Piper's neighborhood in Los Angeles and encountered defendant on the street together with a man named Ernie Sanders. Piper introduced Niles to defendant and told defendant that Niles wanted to discuss the killing of his wife. After talking with defendant, Niles drove away in search of a gun. He returned an hour later, stating that he was unable to locate a gun and asking defendant and Piper if they knew where he could get one. Piper observed Niles and defendant conferring and saw them eventually drive off in Niles's car.

Later that night, Norma Clark, a resident of Corona in Riverside County, was sitting outside of her house in her car, attempting to prevent the theft of her Christmas lights. She lived down the street from Niles and his wife, Sonja Niles. The street lights were on. As Clark sat in her car in the driveway, she saw a red car come down the street and park across from her house. The car lights were off. Clark had seen the car before. She noticed one person in the driver's seat but no one else. Two or three minutes later, Clark heard a noise up the street that sounded like a gunshot or a light bulb popping. She looked toward the direction of the noise and saw running down

[1]All further statutory references are to the Penal Code unless otherwise indicated.

the street a man whom she estimated to be about six feet three or four inches tall, and who wore light-colored pants. He ran directly to the passenger side of the waiting car and climbed in. The car departed with its lights still off.

Shortly thereafter, a Corona police officer discovered Sonja Niles, dressed in a correctional officer's uniform, lying dead near where Clark had witnessed the above described events. She had been killed by a shotgun, the muzzle of which had been pressed against the back of her head, blasting a four- to five-inch hole through her forehead. The force thrust blood, hair and brain matter onto a fence 32 feet away.

At 10:50 p.m., the Corona Police Department received a telephone call from Niles. He said he had picked up his wife from work at 9:15 p.m. and had gone to Los Angeles to see his brother. He said he had been calling her from Los Angeles, but had been unable to reach her. The dispatcher was instructed by Corona Police Department Detective Dale Stewart, who was investigating Sonja Niles's murder, to tell Niles to report for questioning, either at his home or at the police department. Niles drove up to his home in a red Toyota two-door automobile. Norma Clark identified that car as the one she had seen leave the scene after she had heard the gunshot. The police asked Clark to observe Niles, and she stated that he looked to be the man whom she saw running down the street because he had long legs and was tall, but that he was wearing dark pants, unlike the light-colored pants she had observed on the man she had seen running.

Detective Stewart arrested Niles because of the suspicious nature of his phone call, his apparently deceptive behavior, and Clark's statement. He was taken to the Corona Police Department. Among his effects was a card with the name and phone number of a "No-No," who he claimed during interrogation had murdered Sonja Niles. The detectives used a reverse telephone directory to locate the address corresponding to this telephone number.

Two days later, several detectives, including Detective Stewart, went to that address, which was defendant's residence, and were met at the door by defendant's sister, Vicky Barnes. Stewart asked her if "No No" lived there, and she gave defendant's name—"Noel"—and told them he was not home. She attempted to contact defendant by telephoning him at his girlfriend's house and was told that he had stepped out briefly. Stewart asked Barnes if defendant owned a pair of tan-colored pants. She opened the door and began to look through a laundry bag. She removed a pair of khaki pants which were rolled up in a ball. As the pants were unrolled, they revealed large stains of fresh blood and hair in the area between the ankle and the knee on both pant legs, which appeared to greatly surprise Barnes.

After discovering the pants, Barnes received a telephone call from defendant. Stewart spoke to defendant and requested him to return home, although Stewart assured him that he was not a suspect in the murder. When defendant arrived home, Stewart arrested him and advised him of his rights, which he waived. He gave permission to search the bedroom. While the search was being conducted, Stewart questioned defendant. He said he had met Niles on December 13th but denied that he had ever gone to Corona. He said he had been with friends in Los Angeles on the night of the 13th and returned home at 10 p.m. Stewart then showed defendant the khaki pants and asked how he had gotten blood and other matter on them. Defendant responded: "You guys are serious, aren't you?" He then told Stewart a different story: he had met Niles; Niles had told him that he wanted to kill his wife; they had obtained a gun from Ernie Sanders; he and Niles had traveled to Corona together; he had waited at Niles's residence while Niles went to pick up his wife from work at the Department of Corrections; when Niles returned home with his wife, he saw that she was a correctional officer in uniform and informed Niles that he did not want to be involved in the murder; Niles and Sonja Niles argued; he observed her running out of the house with Niles following, and he followed them; Sonja Niles tripped at the curb and fell down on the lawn; Niles then fired the shot that killed her; the blood got on his (defendant's) pants because he was standing by Sonja Niles's head when she fell and was shot. Finally, he and Niles ran together down the street and jumped into the waiting vehicle.

While the search of the apartment was continuing, Stewart asked defendant if the gun that was used for the murder was in his room. Defendant said no. The search soon uncovered under defendant's bed a pump-action shotgun, white tennis shoes, a box of shotgun shells, a towel with powder stains and a left-hand glove. The shoes were stained with blood and brain matter. Defendant was taken to the Corona Police Department, where he made another statement substantially similar to his second statement, except he stated that Niles had told him that his wife was a prison guard before defendant had set eyes on her, and he claimed he had told Niles immediately that he did not want to be involved in the murder. He also stated that Niles had shot Sonja Niles while she was on the ground. He said that Niles drove him back to Los Angeles and that he, Niles, had blood all over him. Defendant took the gun when he was dropped off.

Dr. DeWitt Hunter, who performed the autopsy on Sonja Niles, testified that death was caused by a massive wound to the head consistent with a shotgun blast. The shot traveled from back to front forcing the brain entirely from its cavity. Laceration of the scalp at the back of the head indicated a contact wound, that is, the barrel of the gun was pressed against the victim's

head when the shot was fired. Death was instantaneous. Dr. Hunter opined that the presence of blood and other tissue on a six-foot high fence, thirty-two feet from the murder victim's body, was inconsistent with the victim's being prone at the time of the shot, and that she must have been standing erect or nearly erect. He also testified that he examined the pair of pants and the shoes presented by the prosecution and found them to have blood and brain matter on them. He testified as well that Sonja Niles had a bruise on her upper left arm that appeared to have been inflicted within a few minutes to one hour before death by some hard, straight instrument about one-quarter inch in width.

State Justice Department criminalist John Abercrombie testified that he examined the pants and shoes recovered in defendant's apartment and concluded that the blood on them could have come from the victim, but not from Niles or defendant. He opined that the person wearing the pants at the time of shooting would have had to have been standing relatively close to the victim but not necessarily directly behind her for the pants to be as stained as they were. State Department of Justice criminalist Paul Sham testified that shotgun pellets removed from the victim appeared to be of similar size to pellets contained in a sample of the ammunition found in the search of defendant's apartment. A piece of shotgun wad found at the scene of the shooting was similar to one of the wads contained in the sample shell. He also testified that in August of 1985 he inspected the shotgun found in defendant's apartment and determined it to be visibly undamaged and capable of firing. Corona Police Department evidence technician Sidney Bartholomew testified that he examined the gun found in defendant's apartment, and found what appeared to be dried blood on the muzzle.

In support of the financial-gain special-circumstance allegation, the prosecution presented evidence that on the day of her death Sonja Niles was covered by a $2,500 death benefit by virtue of her membership in the California Correctional Peace Officers' Association (CCPOA), payable to her son; a $50,000 accidental death and dismemberment insurance policy, purchased through CCPOA and payable to her son and Niles; a $40,000 supplemental term life insurance policy, also through CCPOA, payable to her son and Niles; a $1,431 death benefit provided by the California Public Employees' Retirement System (PERS), payable to Niles; a group term life insurance policy through PERS worth $16,453, payable to Niles; a PERS-administered survivor benefit of $350 per month, payable to her son; and an additional $350 payable to Niles should he reach the age of 62. No actual policies were produced, but there was evidence that the son had received and was receiving payments due him under the purported plans of which he was a beneficiary.

The defense theory of the case was that Niles, not defendant, was the murderer, and that defendant had withdrawn from the conspiracy before the murder had been committed. The defense called Corona Police Officer Raymond Cota, who testified that a conversation with Niles's four-year-old son on the night of the murder corroborated that Niles and Sonja Niles had been fighting. He testified that the boy had stated he had heard his mother and father screaming at each other and saw them "boxing." The defense also called Officer Anderson, who had interviewed Norma Clark on the night of the murder. Clark had told him that the person she saw running down the street was six feet, four inches or six feet, five inches tall and that he resembled Niles, who was approximately that height. The parties stipulated that defendant himself was approximately five feet eleven and one-fourth inches tall in his shoes.

Defendant did not testify.

B. *The Penalty Phase*

Evidence of defendant's prior criminal activity was introduced by the prosecution. Correctional Officer Ray Vidales testified that while on duty at Riverside County jail in August of 1987 he was overpowered by the inmates present, defendant among them, in their successful effort to escape. Defendant was awaiting trial in the present case. He handcuffed Vidales to a metal volleyball standard, tied a towel around his mouth, and removed his wallet from his back pocket, taking $6 in cash. He also took Vidales's handcuff key and two jail keys.

Shelley P. testified that in October of 1987, when she was a 19-year-old sophomore at Oregon State College in Ashland, Oregon, and was out jogging in the early morning, she was attacked, assaulted, and raped by defendant. She testified to the emotional impact that the incident has continued to have on her life. Defendant was later apprehended for the rape and held in an Oregon jail. He pleaded guilty to a charge of rape and was convicted. The prosecution also introduced evidence that in January of 1988 defendant and another inmate escaped from the Jackson County, Oregon, jail through a hole battered in the window of the cell. Defendant was apprehended later that day, leaving town in a taxi, and pleaded guilty to the charge of escape. The prosecution also introduced documentary evidence of a 1984 conviction in Los Angeles County for what it characterized as felony grand theft, and which was in fact a conviction for the taking of a vehicle, a felony (Veh. Code, § 10851).

Defendant called several family members to testify regarding his character. Defendant's sister, Brenda Jackson, testified that as children they lived

in the small town of Brownwood, Texas, part of an impoverished family of 11 children raised by a single mother. In Texas defendant had worked in agricultural and other jobs to contribute to the financial support of the family. He had speech problems and attended special education classes. Other children ridiculed him because of his stutter. When Brenda was 14, she left her mother's house with her 8-month-old baby and moved in with defendant, who was living with his girlfriend and her mother. She stated that she considered defendant to be her best brother, and that he had been loving to her. She testified that all but one of her five brothers had been in trouble with the law. She stated she knew about defendant's crimes but that he had never admitted to her that he committed any of them.

Gomelia Bowers, married to defendant's aunt, testified that defendant was a nice "regular kid" who helped with the chores in the house and was very quiet and respectful. Claudette Verner testified she had known defendant for 16 years, was a friend of the family, and that he was very well mannered as a child. Defendant's mother, Bonnie Hill, testified that both she and defendant had received beatings at the hands of defendant's father. The father had left home when defendant was three years old. Defendant was a slow learner with speech problems, and was put into a special school. She said that he made financial contributions to the household when he was working, and that he was the father of two girls and a boy. She stated that defendant was not a bad person and asked the jury to spare his life.

Defendant did not testify.

## II. Jury Selection Issues

### A. *Discovery of Jury Lists and Venire*

 Defendant contends that the trial court erroneously denied him discovery of certain information regarding jury lists and procedures. Owing to this denial, defendant maintains, he was denied a fair opportunity to assert that his jury panel was not drawn from " 'a source fairly representative of the community.' " (*Duren* v. *Missouri* (1979) 439 U.S. 357, 363 [58 L.Ed.2d 579, 586, 99 S.Ct. 664].)

Defendant's claim must be understood against the proper factual background. In July of 1987, over one year before the commencement of defendant's trial, a finding was made in another Riverside County Superior Court case, People v. Neidiffer (No. CR-24472) (hereafter Neidiffer), that the process of selecting jury panels in Riverside County resulted in the underselection of people 18 to 24 years old, poor people, and Hispanics.

Several causes for the underrepresentation were identified: inconsistent methods for excusing prospective jurors, duplications and dated information used in forming the jury pool,[2] and lack of follow-up with those persons not responding to the jury summons. An ad hoc committee consisting of representatives of the municipal and superior courts, the jury commissioner's office, the district attorney and the public defender was formed to reform the jury selection system. The committee made several changes in the procedures for assembling jury venires, including implementation of a consistent policy of excusal from jury service, updating of jury pool master lists more frequently from information obtained from the Department of Motor Vehicles and the Registrar of Voters in order to include more people in the 18-24 age group, and revision of the letter issued to people not responding to the jury summons to state that a warrant will issue for their arrest. It also approved certain interim measures for use while the new procedures were being implemented, including allowing additional peremptory challenges, excusing panels that appeared to be imbalanced, and, if the panel appeared to be unrepresentative, permitting a defendant to contact the jury commissioner to verify the ethnic composition of the venire from which the panel was drawn. A periodic survey to determine the ethnicity of individuals reporting for jury duty was put into place in order to monitor whether the procedural changes implemented were remedying the lack of representation among the identified groups.

In April of 1987, after the motion in Neidiffer had been filed but before it had been decided, codefendant Niles made a discovery motion substantially similar to the one made in that case. In August of 1987, all the discovery material from the Neidiffer case—jury selection procedures and completed jury room survey forms by prospective jurors administered for nine weeks in March and April of 1987, containing information on the income, age and ethnicity of the venire—was made available to Niles and through him to defendant. In September of 1987, Niles filed a supplemental motion, later joined by defendant, which requested, among other things, access to the present master list for the jury pool and for the continued administration of a detailed jury survey similar to the one administered in the Neidiffer case. The purpose of these requests was to determine whether the changes recommended by the ad hoc committee were having the intended effect of curing the underrepresentation found in Neidiffer. The trial court denied the supplemental discovery motion in its entirety. Defendant now claims that the

[2]As explained in *People* v. *Bell* (1989) 49 Cal.3d 502, 520, footnote 3 [262 Cal.Rptr. 1, 778 P.2d 129]: "The jury 'pool' is the master list of eligible jurors compiled for the year or shorter period from which persons will be summoned during the relevant period for possible jury service. A 'venire' is the group of prospective jurors summoned from that list and made available, after excuses and deferrals have been granted, for assignment to a 'panel.' A 'panel' is the group of jurors from that venire assigned to a court and from which a jury will be selected to try a particular case."

court erred in denying the requested discovery, in particular the discovery of the most recent master list and the administration of new jury surveys to test for race, age, and ethnicity.

■ It is uncontroverted that "[i]n California, the right to trial by a jury drawn from a representative cross-section of the community is guaranteed equally and independently by the Sixth Amendment to the federal Constitution (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692]) and by article I, section 16 of the California Constitution (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 272 [148 Cal.Rptr. 890, 583 P.2d 748])." (*Williams* v. *Superior Court* (1989) 49 Cal.3d 736, 740 [263 Cal.Rptr. 503, 781 P.2d 537].) "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." (*Duren* v. *Missouri, supra,* 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587].) Once a prima facie case has been made, "the burden shifts 'to the state to come forward with either a more precise statistical showing that no constitutionally significant disparity existed or that there was a compelling justification for the procedure which results in the disparity in the jury pool.'" (*People* v. *Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561].) But "[w]hen, as here, 'a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, more is required to shift the burden to the People. The defendant must identify some aspect of the manner in which those criteria are being applied that is: (1) the probable cause of the disparity, and (2) constitutionally impermissible.'" (*Id.* at pp. 492-493.)

■ Here we consider not whether defendant has made a prima facie case, but the prior question of whether defendant was wrongly denied the discovery of information necessary to make such a case. A defendant who seeks access to this information is obviously not required to justify that request by making a prima facie case of underrepresentation. Rather, upon a particularized showing supporting a reasonable belief that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion, the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent. (Cf. *City of Santa Cruz* v. *Municipal Court* (1989) 49 Cal.3d 74, 93 [260 Cal.Rptr. 520, 776 P.2d 222] [complaints of excessive force by arresting police officers discoverable by defendant upon "reasonable belief."].) Moreover, in this case, some of the information sought, such as master lists of

jury pools, as well as general jury selection policies and practices, are judicial records that are or should be available to the public. (See *People* v. *Rhodes* (1989) 212 Cal.App.3d 541, 550 [261 Cal.Rptr. 1]; *Pantos* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 258, 262 [198 Cal.Rptr. 489].)

■ But in the present case defendant was not deprived of the ability to discover pertinent information. As noted, the Riverside County Superior Court, in response to the data uncovered in the Neidiffer case, instituted interim measures to enable defendants to address manifestations of continuing underrepresentation among certain classes. These interim measures provided defendant with sufficient opportunities to raise the issue of continuing disparity in the jury pool at the time his jury was to be picked—authorizing him to excuse apparently unrepresentative panels and to obtain information about the venires from which his panels were drawn. There is no indication that he availed himself of these opportunities, or that he lacked the means to discover whether the venire from which *his* jury panel was drawn was representative of the community. Given these interim procedures and the absence of any showing that they were inadequate for defendant's discovery purposes, any error the trial court may have made in denying defendant access to jury pool master lists or other public records was not prejudicial. His claim that he was denied the ability to discover information necessary to make a prima facie showing of underrepresentation is therefore without merit.

## B. *Wheeler/Batson Challenges*

■ Defendant is a Black man. The prosecutor used three of eighteen peremptory challenges to remove Blacks from the jury. No Blacks served on defendant's jury. Defendant now claims that the trial court erred in denying his motion under *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) and *Batson* v. *Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), to dismiss the jury panel.

■ "In *Wheeler*, we held that peremptory challenges may not be used to remove prospective jurors solely on the basis of presumed group bias. We defined group bias as a presumption that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds. [Citation.] The United States Supreme Court similarly held in [*Batson*], that the Equal Protection Clause forbids peremptory challenges of potential jurors solely on account of their race when the defendant is a member of that race. Such challenges may not be used 'to strike black veniremen on the assumption that they will be biased in

a particular case simply because the defendant is black.' " (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1215 [255 Cal.Rptr. 569, 767 P.2d 1047].)

"Under *Wheeler* and *Batson*, if a party believes his opponent is improperly using peremptory challenges for a discriminatory purpose, he must raise a timely challenge and make a prima facie case of such discrimination. Once a prima facie case has been shown, the burden shifts to the other party to come forward with an explanation that demonstrates a neutral explanation related to the particular case to be tried. [Citations.] The court in *Batson* noted that the prosecutor may not rebut the defendant's prima facie case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections: 'If these general assertions were accepted as rebutting a defendant's prima facie case, the Equal Protection Clause "would be but a vain and illusory requirement." ' [Fn. omitted.] [Citation.]

"Both *Wheeler* and *Batson* profess confidence in the ability of the trial courts to determine the sufficiency of the prosecutor's showing. In *Wheeler*, we said that we will 'rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination.' [Citation.] The court indicated likewise in *Batson*. [Citation.] The trial court, however, must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily. . . .' [Citation.]" (*People* v. *Johnson*, *supra*, 47 Cal.3d at p. 1216.)

In the present case, defendant made a *Wheeler* motion at the end of the jury selection process, based on the exclusion of all three Black venirepersons called into the jury box. The trial court stated that it "would hear from the People on their use of preempts . . . ." In so doing, the trial court made at least an implied finding of a prima facie showing of systematic exclusion, thus shifting the burden to the prosecutor to justify each of the challenges. (See *People* v. *Fuentes* (1991) 54 Cal.3d 707, 717 [286 Cal.Rptr. 792, 818 P.2d 75].)

The prosecutor proffered several race-neutral justifications for the exclusion of the Black potential jurors. For Annie Hysmith, the most significant reason was the reluctance she expressed, on her jury questionnaire and during voir dire, to support and impose the death penalty. Verdan Verret, although generally favorable to the prosecution and supportive of the death penalty, had had several bad experiences with the police, and expressed

doubts about their credibility. For Mary Alford the prosecutor offered a number of reasons. He felt, based on her questionnaire, that she would feel "very, very sorry for drug users" and so would feel sympathy for defendant, a drug user; that she scored "not high" on her attitude toward the death penalty; that she said that she could "remember everything," and would therefore be "hypercritical" of witnesses whose recollections were clouded by the passage of time; that she might give too great a weight to psychiatric testimony; that she had a daughter who had recently been prosecuted as a juvenile by the district attorney's office for petty theft; and that she "appeared quite nervous."

At the end of the prosecutor's explanations, the trial court denied the *Wheeler* motion "on the basis of the representations of the People and the Court's own observations of the particular jurors."

Defendant now contends that the prosecutor's reasons for excluding some or all of the Black veniremen were pretextual, and that exclusion was in fact primarily for group bias. Specifically, he argues that, when the responses of the stricken potential jurors are compared to the answers to the same questions of Whites who served as jurors or as alternates, the prosecutor's explanations are undermined. For example, defendant claims that Mary Alford's responses to questions concerning drug users, the psychiatric testimony, and the death penalty, were not appreciably different from those of a number of persons who served on the jury. A number of jurors also had close relatives who had been convicted of criminal offenses, or had themselves been convicted of such offenses. Defendant contends that this comparative analysis strips away a facade of racial neutrality to expose underlying racial bias in the jury selection.

As this court has stated: "If the trial court makes a 'sincere and reasoned effort' to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. In such circumstances, an appellate court will not reassess good faith by conducting its own comparative juror analysis. Such an approach would undermine the trial court's credibility determinations and would discount ' "the variety of [subjective] factors and considerations," ' including 'prospective jurors' body language or manner of answering questions,' which legitimately inform a trial lawyer's decision to exercise peremptory challenges." (*People* v. *Montiel* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) ▮ Here, there is no reason to conclude that the trial court did not make "a sincere and reasoned effort" to evaluate the credibility of the prosecutor's nondiscriminatory justifications. Although the trial court's statement was brief, it apparently independently assessed the prosecutor's reasons for peremptorily challenging the

jurors. (Compare *People* v. *Cummings* (1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1] [no basis in record for concluding that the court failed to scrutinize the prosecutor's reasons] with *People* v. *Fuentes, supra,* 54 Cal.3d at pp. 720-721 [statements of trial court revealed that it had abdicated its responsibility to make a " 'reasoned attempt' " to scrutinize the prosecutor's explanations for each prospective juror in question].) This court has further held that *Wheeler* does not require the trial court to conduct further inquiry into the prosecutor's race-neutral explanations if, as here, it is satisfied from its observations that any or all of them are proper. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1218.) We therefore conclude that the trial court did not abuse its discretion in denying defendant's *Wheeler* motion.

## C. *Denial of Motion as to "Guilt Phase Includables"*

■ Defendant joined a motion by codefendant Niles to prohibit "the prosecution from questioning potential jurors about their attitudes toward the death penalty beyond the minimal inquiry necessary to establish that the venire-person could be fair and impartial in determining guilt or innocence, unless or until it is determined that there will in fact be a penalty phase; and . . . a ruling prohibiting the exclusion of potential jurors who could fairly and impartially determine guilt or innocence but who would never consider voting for the death penalty if a penalty phase was reached." The trial court denied the motion, and defendant now claims that it erred, in violation of his right to a jury drawn from a fair cross-section of the community under the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution. We disagree.

The exclusion of those categorically opposed to the death penalty at the guilt phase of the trial does not offend either the United States Constitution (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 176-177 [90 L.Ed.2d 137, 149-150, 106 S.Ct. 1758]) or the California Constitution (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 956-957 [2 Cal.Rptr.2d 112, 820 P.2d 214]). As the United States Supreme Court explained, death penalty opponents, "or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement." (*Lockhart, supra,* 476 U.S. at pp. 176-177 [90 L.Ed.2d at pp. 149-150]; see also *People* v. *Fields* (1983) 35 Cal.3d 329, 353 [197 Cal.Rptr. 803, 673 P.2d 680].) It is also well settled that this exclusion does not violate defendant's right to an impartial jury. (*Lockhart, supra,* 476 U.S. at pp. 183-184 [90 L.Ed.2d at p. 154]; *Ashmus, supra,* 54 Cal.3d at p. 957.)

Thus *even if it were true,* as defendant argues extensively, that social science evidence now shows conclusively that death-qualified juries are

more prone to convict than those not thus qualified, that evidence does not support a constitutional prohibition of such death qualification. (*Lockhart* v. *McCree, supra*, 476 U.S. at p. 173 [90 L.Ed.2d at pp. 147-148].) His claim is therefore without merit.

## D. *Denial of For-cause Challenges*

■ Defendant contends that he was compelled to exercise four of his peremptory challenges on jurors who professed an unequivocal preference for imposing a sentence of death, rather than one of life imprisonment without possibility of parole, on one convicted of first degree premeditated murder for purpose of financial gain. Defendant eventually exhausted his peremptory challenges.[3] He claims that the wrongful denial of these for-cause challenges violated his rights to due process and a fair trial under the United States and California Constitutions.

We have reviewed the record of the voir dire of each of the four prospective jurors. They gave conflicting answers regarding their ability to consider both penalty options available to them, but they all agreed, during the prosecutor's voir dire, that they could fairly consider the option of life imprisonment without possibility of parole. Each modified his or her initial strong stance in favor of the death penalty in the abstract with the willingness to consider the particular circumstances of the case, and to follow the applicable law, at the penalty phase. "Where equivocal or conflicting responses are elicited, the trial court's determination of the prospective jurors' states of mind is binding on an appellate court." (*People* v. *Beardslee* (1991) 53 Cal.3d 68, 103 [279 Cal.Rptr. 276, 806 P.2d 1311].) "On this record, we cannot say that, as a matter of law, the jurors' views on capital punishment would have prevented or substantially impaired the performance of their duties as jurors in accordance with their instructions and their oath." (*Ibid.*; see *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851-852, 105 S.Ct. 844].) Therefore, the trial court did not abuse its discretion in denying defendant's for-cause challenges.

■ Defendant also contends that one of the prospective jurors professed a racial bias against Black people, and the court wrongly denied his for-cause challenge, requiring a peremptory challenge for his removal. This

---

[3]We note that the People argue that defendant, at several points prior to exhaustion of his peremptories, expressed satisfaction with the jury as it was. The People argue that defendant's exhaustion of his peremptories was solely a tactical maneuver in order to preserve the issue of wrongful denial of the for-cause challenges on appeal. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1088 [259 Cal.Rptr. 630, 774 P.2d 659] [defendant must exhaust peremptory challenges, or produce good reasons for not exhausting peremptories, before claiming that a denial of a for-cause challenge violated his constitutional rights].) Because we determine that the denial of the for-cause challenges was not error in this case, we need not reach the issue of whether defendant had in fact preserved his constitutional challenges.

juror, too, gave conflicting responses. He stated that he had been raised with racial prejudice but that he had "grown out of" the prejudice. He also expressed his belief, derived from "the media," that Blacks were more likely to have committed a crime than Whites, but professed his ability to judge each case individually. Given these equivocal answers, we cannot say that the trial court abused its discretion in denying defendant's for-cause challenge. (See *People* v. *Pride* (1992) 3 Cal.4th 195, 229 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

### E. *Prosecutor's Use of Peremptory Challenges to Excuse "Death Penalty Skeptics"*

Defendant claims that the prosecutor used his peremptory challenges to systematically exclude prospective jurors who professed skepticism about the death penalty but were not excludable for cause on that basis. He further claims that as a result he was denied due process, the right to an impartial jury, and the right to a reliable determination of guilt and penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and their California equivalents. We have rejected substantially similar contentions (*People* v. *Marshall* (1990) 50 Cal.3d 907, 927 [269 Cal.Rptr. 269, 790 P.2d 676]), and decline to reconsider them here.

### III. GUILT PHASE ISSUES

### A. *Suppression of Evidence Pursuant to Section 1538.5*

 Defendant claims that his motion to suppress evidence of the pair of blood-soaked khaki pants, 12-gauge shotgun, ammunition, and various other pieces of evidence discovered in his sister's home was wrongly denied, and that the evidence was illegally obtained in violation of his right against unreasonable search and seizure under the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution. He further contends that the trial court exceeded its jurisdiction in permitting the prosecution to relitigate the search and seizure issue before trial, in violation of section 1538.5, subdivision (j). As will appear, his claims are without merit.

Defendant moved before trial to suppress the above mentioned evidence pursuant to section 1538.5. The trial court held a hearing on the matter at which defendant's sister, Vicky Barnes, and Corona Police Detectives Dale Stewart and Alex Marmolejo testified, providing the court with markedly different accounts of the relevant facts.

. According to Detective Stewart, he went to Barnes's home to find a person named "No-No," who had been identified by Niles as the murderer of

his wife. Stewart was accompanied by Special Agent James Guiton of the California Department of Corrections and three police officers from the City of Los Angeles. At the time he arrived at the scene, Detective Stewart believed that Niles had lied to him and did *not* believe that defendant had been involved in the crime. Upon initial questioning, Barnes stated that a "Noel" lived there, referring to defendant, but that he had recently left to visit his girlfriend.

Barnes permitted Detectives Stewart and Marmolejo to enter the apartment. Detective Stewart told Barnes and defendant's mother, who was also present, that he did not suspect defendant of the murder. Stewart asked whether defendant owned any light-colored pants—a witness had identified the person running from the murder scene as wearing light-colored pants. Barnes, without replying, went into defendant's bedroom and retrieved a rolled up pair of khaki pants. As recounted above, she unrolled them in the police officer's presence, revealing that the pant legs, from the knee down, were covered with blood and other organic matter. Barnes was surprised and visibly shaken by this revelation and began crying.

Shortly after this occurred, defendant phoned. Barnes told him that the police were there and wanted to speak to him. She did not attempt to warn him off. She put him on the phone with Stewart, who told him he wanted to question him in person. Thereafter, Stewart attempted to use the telephone to get a search warrant. Barnes grabbed the telephone out of Stewart's hands, unplugged it, and ordered the police out of her house. Stewart replied that he was obtaining a search warrant and intended to search the house. An altercation ensued in which Barnes was eventually handcuffed and taken outside.

Stewart also testified that when defendant arrived at the house and was arrested, he waived his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and denied having been in Corona. Once defendant was confronted by the bloody pants, however, he changed his story, admitting that he had accompanied Niles to Corona, that they had obtained a shotgun, that he had been at the scene when Sonja Niles was murdered, and that the blood had gotten on his pants when the victim fell. He denied having direct involvement in the murder, however, stating that he had backed out of the initial plan when he learned that Sonja Niles was a correctional officer. He consented to a search of his bedroom. The search uncovered, among other things, a 12-gauge shotgun, ammunition, and a pair of tennis shoes with blood and other matter on them.

Barnes, in contrast, testified that she did not invite the police inside her home. One of the officers asked her for permission to check whether

defendant was present. She consented and accompanied the officer. Upon their return, she found the other officers had entered the apartment and were beginning to search it. When Barnes questioned the police activity, Stewart told her to "sit down and shut up." According to Barnes, Stewart stated that he would get a search warrant and "tear the son of a bitch apart," by which she understood him to mean he would use the search warrant to tear her home apart. At some point, defendant called and Barnes handed the phone to Stewart. Soon thereafter, concerned that the police would do damage to her apartment, she unplugged the phone. In response Stewart threw Barnes to the floor, handcuffed her, and removed her from the apartment.

Most importantly, Barnes insisted that, although she was questioned about defendant's light-colored pants, she had stated that she did not know where he kept his laundry and at no time checked his laundry bag, much less showed the pants to the police.

Detective Marmolejo testified in rebuttal, confirming Stewart's version of events.

The trial court denied the suppression motion, but in doing so, made factual findings that were potentially adverse to the People. The court found Barnes's testimony that she had not found or shown the bloodstained pants to be credible, and the court chose not to believe Stewart's and Marmolejo's version of events. The trial court found, rather, that the bloody pants had been discovered during the search pursuant to defendant's consent once defendant was arrested. The trial court nonetheless found the consent to be have been lawfully obtained, and therefore denied defendant's motion to suppress.

Eleven days later, the prosecution filed a motion to "augment and reconsider" the motion to suppress, pursuant to Code of Civil Procedure section 128, subdivision (a)(8). The grounds for motion were, in essence, that Barnes's testimony had taken the prosecution by surprise and that the trial court's factual findings could lead to an eventual dismissal of the case against defendant. The motion was accompanied by a transcript of an interview with Special Agent Guiton, and a police report prepared the day of defendant's arrest by an officer of the Los Angeles Police Department, both of which contradicted Barnes's account of events and corroborated Stewart's and Marmolejo's. At a second hearing on his suppression motion, the court heard the testimony of Special Agent Guiton, and two of the Los Angeles police officers who had been present on the scene, who confirmed the account of the Corona police officers. The trial court granted the motion over defendant's objection on the grounds that the prosecutor had submitted

new evidence, as well as that the interests of justice would be served. It subsequently modified its factual findings, concluding that Detective Stewart's version of events was the correct one.

Defendant's contention that his suppression motion was wrongly denied is predicated on three claims. First, he contends that the trial court exceeded its jurisdiction in reopening the suppression hearing under section 1538.5, subdivision (j), and that we are bound by the trial court's factual findings after the *first* hearing when determining the lawfulness of the search and seizure. Second, he contends, those findings led to the conclusion defendant was wrongfully arrested by the police. Third, he claims that the trial court wrongly concluded, after the first suppression hearing, that he had lawfully consented to the search of his room, because his wrongful arrest tainted the supposed subsequent consent. We need not address his second and third claims because we find his first claim to be without merit. To understand why this is so, we must briefly review the statutory scheme set forth in section 1538.5.

As we have stated: "Section 1538.5 provides a comprehensive and exclusive procedure for the final determination of search and seizure issues prior to trial. Its enactment was chiefly aimed at redressing defects identified in the previously existing procedures: (i) the unnecessary expenditure of time and effort in allowing repeated challenges to the legality of a search or seizure during the course of a criminal proceeding; (ii) the waste of jury time in permitting search and seizure questions to be raised during trial, since the determination of these issues takes place outside the presence of the jury; and (iii) the lack of adequate opportunity for the prosecution to obtain appellate review of an adverse decision on a search and seizure question before trial commences and jeopardy attaches. [Citations.] [¶] In accordance with these objectives, section 1538.5 requires that a defendant's motion for the return of property or suppression of evidence obtained as a result of a search or seizure be made at an early stage. In the case of a felony offense initiated by complaint, the motion may be made at the preliminary hearing before the magistrate. [Citation.] Additionally, if the defendant is held to answer at the preliminary hearing or the felony is charged by indictment, the defendant is entitled to renew or make the motion in superior court at a special de novo hearing." (*People v. Brooks* (1980) 26 Cal.3d 471, 475-476 [162 Cal.Rptr. 177, 605 P.2d 1306].) A defendant may also make a suppression motion for the first time at trial if "opportunity for this motion did not exist or the defendant was not aware of the grounds for the motion." (§ 1538.5, subd. (h).)

The People's ability to contest the suppression of evidence is likewise governed by section 1538.5. Subdivision (j) provides, in pertinent part, that:

"If defendant's motion [for return of property or suppression of evidence] is *granted* at a special hearing in the superior court, the people, if they have additional evidence relating to the motion and not presented at the special hearing, shall have the right to show good cause at the trial why the evidence was not presented at the special hearing and why the prior ruling at the special hearing should not be binding, or the people may seek appellate review as provided in subdivision (o) . . . ." (Italics added.)

 Defendant contends that the trial court acted contrary to statute by permitting relitigation of the suppression motion before trial and without good cause. But neither subdivision (j), nor any other part of section 1538.5, applies literally to the situation before us, in which the People seek to reopen a suppression motion that has been *denied*. Nor can such an application be implied, in light of the express terms of the statute.

Defendant nonetheless claims that this prohibition can be implied from section 1538.5, subdivision (m). That subdivision states that section 1538.5, and several other sections not relevant here, "shall constitute the sole and exclusive remedies prior to conviction to test the unreasonableness of a search or seizure where the person making the motion . . . is a defendant in a criminal case and the property or thing has been offered or will be offered as evidence against him or her." The exclusivity language in subdivision (m) must be read, however, in the context of the entire statute of which it is a part. (See *People* v. *Morris* (1988) 46 Cal.3d 1, 16 [249 Cal.Rptr. 119, 756 P.2d 843].) Section 1538.5 governs the means by which a defendant can move to suppress evidence resulting from an illegal search and seizure, and, in subdivisions (h), (i), and (j), the means by which both the defendant and the People can challenge an adverse ruling on a suppression motion. Thus the term "exclusive remedies" must be understood, in light of the subject matter encompassed by the statute, to signify the available avenues for suppressing evidence and for relief from *unfavorable* rulings on the suppression of evidence, not to a modification of a favorable ruling, which the statute nowhere addresses. There is no indication that the Legislature intended, in section 1538.5, to preclude such modification.

Defendant quotes our language in *Madril* v. *Superior Court* (1975) 15 Cal.3d 73 [123 Cal.Rptr. 465, 539 P.2d 33], that the determination of a section 1538.5 motion at a special hearing in superior court "whether in the defendant's or in the People's favor—deprives that court of jurisdiction to reconsider the matter unless the People, pursuant to subdivision (j), seek to reopen the matter *at trial* upon a showing of good cause." (15 Cal.3d at pp. 77-78, italics in original.) In *Madril* the People moved to reopen, prior to trial, a suppression motion that had been granted, claiming that " 'through

haste and inadvertence important areas of inquiry were not fully explored.' " (*Id.* at p. 74.) In holding that the trial court lacked jurisdiction for such pretrial reconsideration, we disapproved of dicta in earlier cases asserting that the trial court has the inherent power to reconsider suppression motions prior to the expiration of the 30-day period for seeking writ review under section 1538.5, subdivisions (o) and (i). (15 Cal.3d at p. 77.) We were clearly concerned in *Madril* with a situation explicitly covered by section 1538.5, that is, the prosecution's motion to reconsider a granted suppression motion. Our statement that the trial court had no jurisdiction for such reconsideration before trial was simply another means of conveying that the trial court had no inherent power to do that which the statute expressly forbade—to reconsider a granted suppression motion other than as prescribed in subdivision (j). We did not consider in *Madril* the unusual situation presented in this case in which the prosecution seeks reconsideration of unfavorable factual findings in a denied suppression motion. Nothing in the logic of *Madril* compels us to conclude that the trial court exceeded its jurisdiction in this case.

Because the People's motion to "augment and reconsider" the suppression motion was not governed by section 1538.5, we agree with the People that the trial court's ability to grant relief is instead controlled by Code of Civil Procedure section 128, subdivision (a)(8), which states that every court will have the power to "amend and control its process and orders so as to make them conform to law and justice." We have recognized the power of trial courts to use Code of Civil Procedure section 128, subdivision (a)(8) to correct erroneous *in limine* rulings in criminal cases. (*People* v. *Keenan* (1988) 46 Cal.3d 478, 513 [250 Cal.Rptr. 550, 758 P.2d 1081]; see also *People* v. *McGee* (1991) 232 Cal.App.3d 620, 627-628 [283 Cal.Rptr. 528].) Indeed, prior to the adoption of Penal Code section 1538.5, the predecessor to Code of Civil Procedure section 128, subdivision (a)(8), was held to be the source of a trial court's inherent authority to modify a suppression order. (*People* v. *Beasley* (1967) 250 Cal.App.2d 71, 77 [58 Cal.Rptr. 485].) Accordingly, we conclude that Code of Civil Procedure section 128, subdivision (a)(8), gives the court the discretion to modify the factual findings of a denied suppression order, as requested by the prosecution or sua sponte, in the interests of justice. There is no showing in this case that the trial court abused its discretion to make such a modification.

 Nor can we say, on the record before us, that the trial court's finding that Barnes consented to show the police the bloody pants was not based on substantial evidence. Given that conclusion, it follows that defendant was arrested with probable cause, and his subsequent consent to search after the voluntary waiver of his *Miranda* rights was lawfully obtained. We

therefore conclude that the trial court did not err in denying defendant's motion to suppress.

### B. *Validity of Miranda Waiver*

■■■ As recounted above, defendant was advised of his rights under *Miranda* v. *Arizona*, *supra*, 384 U.S. 436. He waived those rights and confessed to having been with Niles when the latter murdered his wife, although he disavowed any participation in the murder. He later gave a second statement, taped at the Corona Police Department, essentially reiterating the first statement in somewhat greater detail. He moved before trial to exclude both of his statements under Evidence Code section 402. The trial court denied the motion. He now contends that the trial court erred in allowing these statements to be admitted into evidence.

Specifically, defendant contends on appeal that Detective Stewart made material misrepresentations to him that deceived him into making his incriminating statements. As explained above, Stewart was present at the apartment defendant shared with his sister when defendant telephoned. Stewart told him that he was from the City of Corona, that he was investigating a homicide, that someone had said that he was present when the homicide had occurred, but that he, Stewart, did not believe the person supplying that information. Stewart further told defendant he wanted him to come back to the apartment to make a statement while Stewart was in Los Angeles. He agreed to do so. What Stewart did not tell him was that he had already discovered the bloodstained pants and that he had become a suspect in Sonja Niles's murder. He eventually arrived, was arrested and handcuffed and read his *Miranda* rights. He denied ever having been to Corona, but after being shown the bloody pants, he said: "You guys are serious, aren't you?" Stewart responded that he was "real serious," at which point defendant made his statement admitting his presence at, though not his direct participation in, Sonja Niles's murder.

" '[T]he use of deception or communication of false information to a suspect, [although it] does not alone render a resulting statement involuntary [citation], . . . is a factor which weighs against a finding of voluntariness. [Citations.]' " (*People* v. *Thompson* (1990) 50 Cal.3d 134, 167 [266 Cal.Rptr. 309, 785 P.2d 857].) Defendant contends that because Stewart had misrepresented to him over the telephone that he was not a suspect in the murder, he did not realize that he was a suspect at the time he gave his statement, and therefore did not knowingly waive his right to remain silent. Defendant further contends that the police deception in this case resembles that in *U.S.* v. *Rogers* (5th Cir. 1990) 906 F.2d 189, in which the court found the

defendant's waiver of his *Miranda* rights to be invalid when the police initially led him to believe that he was not a criminal suspect and did not inform him otherwise until after he made his incriminating statement. (*Id.* at pp. 191-192.) But the voluntariness of a suspect's waiver is not called into question when, as in this case, the police use a misrepresentation to lure a suspect into custody, yet reveal the misrepresentation before the suspect makes a statement. In this case, the misrepresentation employed by Stewart —that defendant was not a suspect in the case—had already been exposed as false. At the time defendant made his statement, he had been arrested, handcuffed, asked about the murder, and had been shown the bloodstained pants. He therefore must be presumed to have been acutely aware that, whatever Stewart had told him over the telephone, he was a suspect. We therefore conclude that defendant's contention that he did not knowingly waive his right against self-incrimination is without merit.[4]

### C. *Use of Two Juries*

Before trial, both Niles and defendant moved to sever the trial. The prosecution opposed the motion, proposing instead the use of two juries, acknowledging the possibility that there was some evidence, particularly the extrajudicial statements of Niles incriminating defendant, that might not be admissible at defendant's separate trial. The trial court denied the motion for severance and granted the prosecution's request. Defendant now contends that the trial court abused its discretion in opting for a dual jury rather than for severance, and that such abuse led to the violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and their counterparts under the California Constitution. We find, however, that no such abuse of discretion occurred.

Two defendants jointly charged with the same offense must be tried together, except when the trial court in its discretion orders separate trials. (§ 1098; *People* v. *Massie* (1967) 66 Cal.2d 899, 916 [59 Cal.Rptr. 733, 428 P.2d 869].) An abuse of discretion occurs when the failure to sever leads to the admission at one defendant's trial of incriminating extrajudicial statements by a joint defendant that would otherwise be inadmissible in a separate trial. (*People* v. *Aranda* (1965) 63 Cal.2d 518, 529-530 [47 Cal.Rptr. 353, 407 P.2d 265]; *Bruton* v. *United States* (1969) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620].) In *People* v. *Harris* (1989) 47 Cal.3d

---

[4]Defendant further contends that his waiver was not knowing and intelligent because when he was read his *Miranda* rights he was not additionally informed that he could be sentenced to death for the crime of which he was suspected. But, as we have stated, a "[d]efendant has no right to be advised about the penal consequences of the charges that he faces prior to interrogation." (*People* v. *Clark* (1993) 5 Cal.4th 950, 987, fn. 11 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

1047, 1070-1076 [255 Cal.Rptr. 352, 767 P.2d 619], we held that the problem addressed in *Bruton* and *Aranda* may be solved by the use of separate juries for codefendants, with each jury to be excused at appropriate times to avoid exposure to inadmissible evidence. We rejected various constitutional and statutory arguments against the dual jury system and concluded that it is "a permissible practice" and "is not a basis for reversal on appeal in the absence of identifiable prejudice resulting from the manner in which it is implemented." (*Id.* at p. 1075.)

Defendant contends that several instances of such prejudice occurred. First, he claims that the longer trial led to a greater than usual number of jurors excused for hardship, which in turn "trigger[ed] fair cross-section concerns . . . ." He does not articulate, however, what these concerns might be, or which cognizable groups were systematically excluded. Nor, even if he were to identify such groups, has he carried his burden of proving that the use of a dual jury—a race-, class-, and gender-neutral procedure—is constitutionally impermissible. (See *People v. Sanders, supra,* 51 Cal.3d at pp. 492-493.)

Second, defendant contends that Niles's counsel served, in effect, as a second prosecutor, bringing out in cross-examination on a number of occasions testimony detrimental to defendant. Yet he does not identify any evidence elicited by Niles's counsel that would have been inadmissible at a separate trial. The mere fact that a damaging cross-examination that the prosecution could have undertaken was performed instead by codefendant's counsel did not compromise any of defendant's constitutional or statutory rights.

Third, defendant contends that the failure to sever "effectively deprived [him] of the benefit of his codefendant's testimony." We have indeed held that "the possibility that at a separate trial a codefendant would give exonerating testimony" weighs in favor of severance. (*People v. Massie, supra,* 66 Cal.2d at p. 917.) Here, however, there is no basis for supposing that Niles, whose defense was to place the blame on defendant, would have contradicted himself with testimony exonerating defendant at the latter's trial.

Fourth, defendant contends that the fact that his and Niles's defenses were antagonistic also weighs in favor of severance. (See *People v. Massie, supra,* 66 Cal.2d at p. 917.) But as we recently stated: "That defendants have inconsistent defenses and may attempt to shift responsibility to each other does not compel severance of their trials [citation], let alone establish abuse of discretion in impaneling separate juries." (*People v. Cummings, supra,* 4

Cal.4th at p. 1287.) Here, as in *Cummings*, "the defense positions were antagonistic because the identity of the killer was disputed by defendants. That each was involved in the incident was undisputed, however, and the prosecution had offered evidence sufficient to support verdicts convicting both defendants. . . . [T]his was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was [the guilty] person." (*Ibid.*) In short, the trial court did not abuse its discretion by refusing to sever defendant's and Niles's trial, inconsistent defenses notwithstanding.

### D. *Testimony in Defendant's Absence*

 Defendant claims that his voluntary absence from the court on December 15, 1988, during the taking of evidence, violated sections 977 and 1043. We conclude that he is correct in his assertion that the court committed statutory error by permitting him to absent himself from trial during the taking of evidence. We further conclude that such error was not prejudicial.

On December 15, 1988, during the prosecution's presentation of its case, defendant appeared in the court room with a black eye, and his counsel requested a continuance so that defendant would not make a negative impression on the jury. The court denied the continuance. Counsel then indicated to the court that defendant preferred to absent himself from the trial for that day. The prosecutor stated that he planned to examine Anthony Piper, a witness who testified to defendant's initial association with Niles. The prosecution also planned to examine two criminalists, Sham and Abercrombie, and to continue the examination of Detective Stewart. Defendant's counsel, in open court, explained to defendant that he had the right to be present, and that these witnesses would be testifying during his absence. He further explained to the court, and clarified for defendant, that, by prior decision, he would not be cross-examining Piper. The prosecutor additionally emphasized that defendant was potentially eligible for the death penalty. In response to several inquiries from the court and from defense counsel, defendant made clear that he did not wish to be present in court that day. Indeed, he sat with his back to the court and indicated that he might sit in that manner if he were not allowed to leave. He declined the court's offer to be in chambers and to hear the proceedings, instead opting to be taken back to jail.

 A defendant has the right, under the Sixth Amendment of the federal Constitution, to be present at trial during the taking of evidence. (*United States* v. *Gagnon* (1985) 470 U.S. 522, 526 [84 L.Ed.2d 486, 490, 105 S.Ct. 1482]; *People* v. *Johnson* (1993) 6 Cal.4th 1, 17 [23 Cal.Rptr.2d

593, 859 P.2d 673].) Nonetheless, as we have concluded, "as a matter of both federal and state constitutional law, . . . a capital defendant may validly waive presence at critical stages of the trial." (*People* v. *Price* (1991) 1 Cal.4th 324, 405 [3 Cal.Rptr.2d 106, 821 P.2d 610].) In that case, defendant requested to be absent from the trial, an absence that lasted through much of the guilt phase. We found "no constitutional infirmity in the trial court's decisions in [that] case to accept defendant's actions as a voluntary waiver and to proceed with the guilt phase in defendant's absence." (*Ibid.*) ▮▮▮ We similarly find no constitutional infirmity in the present case with the defendant's voluntary waiver of his right to be present on a single day of the trial.

Statutory error is another matter. Section 977, subdivision (b)(1), states in pertinent part that "[i]n all cases in which a felony is charged, the accused *shall* be present" at various times during the process, including "during those portions of the trial when evidence is taken before the trier of fact . . . ." (Italics added.) That subdivision further provides that "[t]he accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . ." Section 1043 further provides that a felony defendant "shall be personally present at trial," (*id.*, subd. (a)), but that the trial may continue in a defendant's absence if (1) defendant persists in disruptive behavior after being warned (*id.*, subd. (b)(1)); (2) defendant is voluntarily absent in "[a]ny prosecution for an offense *which is not punishable by death*" (*id.*, subd. (b)(2)); and (3) if a defendant has waived his rights in accordance with section 977 (*id.*, subd. (d), italics added). Thus, when read together, sections 977 and 1043 permit a capital defendant to be absent from the courtroom only on two occasions: (1) when he has been removed by the court for disruptive behavior under section 1043, subdivision (b)(1), and (2) when he voluntarily waives his rights pursuant to section 977, subdivision (b)(1). However, section 977, subdivision (b)(1), the subdivision that authorizes waiver for felony defendants, expressly provides for situations in which the defendant cannot waive his right to be present, including during the taking of evidence before the trier of fact. Section 1043, subdivision (b)(2), further makes clear that its broad "voluntary" exception to the requirement that felony defendants be present at trial does not apply to capital defendants. Thus the trial court, by permitting a nondisruptive capital defendant to be absent during the taking of evidence, committed error under sections 977 and 1043.

The People's arguments to the contrary are unpersuasive. First, although we have decided on numerous occasions that voluntary waiver was not constitutional error we have not, the People's contrary implication notwithstanding, settled the question whether a defendant's absence during one of

the proceedings during which he or she is mandated to be present under section 977 violates that statute. We expressly left that question open in *People* v. *Edwards* (1991) 54 Cal.3d 787, 810 [1 Cal.Rptr.2d 696, 819 P.2d 436], and have not directly addressed the statutory issue since then. Although we rejected the argument that "a defendant who does not want to be present during jury selection can achieve his wish only if he engages in 'disruptive behavior,' " (*id.* at p. 809), we left undecided whether a capital defendant's capacity to absent himself at trial applies to "proceedings . . . specifically listed in section 977, subdivision (b)" (*id.* at p. 810). We are now persuaded by the plain meaning of the statute that a capital defendant may not voluntarily waive his right to be present during the proceedings listed in section 977, including those portions of the trial in which evidence is taken, and that he may not be removed from the courtroom unless he has been disruptive or threatens to be disruptive. The Legislature evidently intended that a capital defendant's right to voluntarily waive his right to be present be severely restricted. Of course, we will generally defer to the trial court in determining when a defendant has been disruptive or when further disruption may be reasonably anticipated. (See *People* v. *Price*, *supra*, 1 Cal.4th at pp. 405-406.) The trial court's ability to remove a disruptive or potentially disruptive defendant follows not only from section 1043, subdivision (b)(1), but also from the trial court's inherent power to establish order in its courtroom. (See Code Civ. Proc., § 1209 [trial court has the power to sanction various acts of contempt of court].) In the present case, however, the trial court did not remove defendant to prevent disruption, nor does the record reveal that defendant was engaging in disruptive behavior. We therefore conclude that the trial court erred, under sections 977 and 1043, in granting defendant's request to absent himself during the taking of evidence.

We turn, then, to the question of prejudice. As discussed above, the error in this case is of a purely statutory dimension. We will therefore reverse the judgment only if we can conclude "that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

No such reasonable probability appears in the present case. Defense counsel stated, prior to securing defendant's waiver, that they had both decided beforehand not to cross-examine Piper, and therefore defendant's absence during that testimony was not likely to affect the outcome of the trial. Nor was his absence during the forensic testimony of the criminalists, who were also not cross-examined, regarding blood tests and the shotgun used to kill Sonja Niles, likely to alter the trial's outcome. Detective Stewart, who also testified, was recalled by the prosecution when defendant was

present, and was cross-examined at that time. Finally, the court properly informed the jury that defendant had been voluntarily excused for good cause and that the jury was not to consider his absence in any respect. We therefore conclude that the trial court's error was not prejudicial.

### E. Denial of Motion to Admit Results of Polygraph Examination

Before trial, defendant submitted to a polygraph examination administered by a sergeant in the Redlands Police Department who was a licensed polygrapher. The examiner asked defendant whether he had (1) shot Niles's wife, (2) pulled the trigger on the gun that shot Niles's wife, and (3) had seen Niles shoot his wife. Defendant's answer to these questions were "no," "no," and "yes" respectively. The examiner concluded that defendant was answering truthfully. Prior to trial, defendant moved to have the results of the examination introduced into evidence. The prosecutor objected on the grounds that such admission would violate Evidence Code section 351.1, which provides in pertinent part that "the results of a polygraph examination . . . shall not be admitted into evidence in any criminal proceeding . . . unless all parties stipulate to the admission of such results." The prosecutor declined to stipulate as to the admission of the polygraph evidence. The court permitted defendant to make an offer of proof of the polygrapher's testimony, and the polygrapher testified as to the results of defendant's test. Defendant argued that, notwithstanding Evidence Code section 351.1, the polygraph testimony was relevant and should be admitted. The court denied the motion.

Defendant contends on appeal that the trial court erred. He claims that, Evidence Code section 351.1 notwithstanding, we should consider whether the polygraph examination has gained general acceptance within the relevant scientific community and is therefore admissible under the principles of *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] and *Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46], recently reaffirmed in *People* v. *Leahy* (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321]. He further contends that because Evidence Code section 351.1 bars his admission of reliable exculpatory evidence, it violates federal due process. (See *Green* v. *Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738, 741, 99 S.Ct. 2150].) Even if defendant's argument were true in the abstract, he has failed to make the proper offer of proof under *Kelly/Frye* that the polygraph is now viewed in the scientific community as a reliable technique. " '. . . Having failed to make the proper offer of proof, defendant is in no position to assign error in the trial court's ruling.' " (*People* v. *Fudge* (1994) 7 Cal.4th 1075, 1122 [31 Cal.Rptr.2d 321, 875 P.2d 36].) The sole witness to testify in support of the motion was the police

sergeant who administered the test, who was not competent to testify as to the polygraph's acceptance in the relevant scientific community. Defendant's claim is therefore without merit.

## F. *Disclosure of Defendant's Probation Status*

Defendant contends that his conviction must be reversed because the jury mistakenly received evidence that he was on probation for grand theft auto at the time of his arrest. The pertinent facts are as follows.

Among the exhibits submitted into evidence was a tape of defendant's interview with the Corona Police made shortly after his arrest. The tape was accompanied by a printed transcript of the interview, which was distributed to the jury when the tape was played. After the tape had been partly played, defense counsel requested the tape be turned off, and informed the court he did not wish the jury to hear the portion of the interview in which defendant admitted to being on probation for "grand theft auto." In response, the court ordered that the transcripts be collected from the jury. The prosecutor and Detective Stewart read aloud from the transcript, omitting the portion of the transcript to which defendant had objected. Later, an edited transcript deleting the proscribed portions was prepared and submitted into evidence. The court ordered that the edited version be identified as exhibit 60 and the unedited version be identified as exhibit 53. Apparently through clerical error, the reverse designation was made. During its guilt phase deliberations, the jury requested to see the transcript. Defendant conjectures that, because of the confusion in the exhibit numbering, the jury was in fact given the unedited transcript, and that it learned, to defendant's prejudice, of his prior conviction and probationary status.

We are unable to discern, on the bare record, which version of the transcript was given to the jury. We must therefore presume, under Evidence Code section 664, that "the clerk 'regularly performed' her official duty and submitted to the jury only the admissible portions of any exhibits which they requested." (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1056 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) The fact that the clerk transposed the numbers on the two exhibits does not mean that she did not carry out her duty to distribute only the edited version.

Even if clerk's error was committed, however, it was not prejudicial. " 'When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct.' [Citation.] Rather, all that appears is ordinary error. . . . [¶] . . . [W]ith ordinary error, prejudice must be shown and reversal is not required unless there is a reasonable probability

that an outcome more favorable to the defendant would have resulted." (*People* v. *Clair* (1992) 2 Cal.4th 629, 668 [7 Cal.Rptr.2d 564, 828 P.2d 705].) In this case, there was no reasonable probability of a more favorable outcome. Passing reference to his probationary status and his prior conviction for a nonviolent offense was overshadowed by the considerable evidence against defendant, including Piper's testimony regarding the conspiracy between defendant and Niles, Clark's eyewitness testimony, and the bloody pants and gun found in defendant's bedroom. The clerk's error, if error there was, therefore was not prejudicial.[5]

### G. *Admission of Defendant's Fight With Piper*

■ Defendant filed a motion *in limine* for an order instructing the People's and Niles's counsel to refrain from introducing into evidence certain of his prior criminal acts on the grounds that they were more prejudicial than probative, and therefore should be barred under Evidence Code section 352. The trial court granted the motion and issued an order prohibiting the introduction of evidence as to the following items: defendant's escape from Riverside County jail, his alleged false imprisonment and robbery of a correctional officer during that escape, his carrying of a concealed weapon in Redding, his acts of rape, kidnap, escape, burglary and criminal mischief in Oregon, and his gang affiliation. At trial, during Niles's cross-examination of Anthony Piper, the latter testified, without objection, to a quarrel he had with defendant, in which "[he] pushed me and I pushed him and a couple of people came and broke it up." Defendant claims on appeal that the trial court's aforementioned order extended broadly to prohibit any testimony about his previous violent acts. But the trial court's order did not bar all such testimony, only the criminal acts specified above. Nor can defendant claim, as he also does on appeal, that such testimony should have been barred under Evidence Code section 352 as more prejudicial than probative, because he failed to object. "In the absence of an erroneous ruling on an objection or request that a nonresponsive answer be stricken and the jury instructed to disregard it, there is no error." (*People* v. *Harris*, *supra*, 47 Cal.3d at p. 1089.)[6]

---

[5]Defendant also contends that the erroneous admission of the unedited transcript violated his right to due process, an impartial jury, and a reliable determination of guilt under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and comparable provisions in the California Constitution. No federal constitutional error appears. Certainly none is shown by defendant. (See *People* v. *Clair*, *supra*, 2 Cal.4th at pp. 661, fn. 6, 669, fn. 10.)

[6]Defendant also contends that the admission of Piper's testimony violated rights to due process and a fair trial found in the federal and California Constitutions. Because he failed to

## H. *Shackling of Defendant*

Defendant was shackled on one hand and on his feet during trial. He requested the removal of the hand shackle, which was apparently visible to members of the jury, but his request was denied. He claims prejudicial error from the visible shackling.

Physical restraints cannot be imposed " 'in the absence of a record showing of violence or a threat of violence or other nonconforming conduct.' " (*People* v. *Hawkins* (1995) 10 Cal.4th 920, 944 [42 Cal.Rptr.2d 636, 897 P.2d 574].) The trial court's decision to shackle will be reviewed for abuse of discretion. (*Ibid.*) No such abuse is manifest here. Defendant was facing recent charges of escape from Riverside County jail and false imprisonment of a correctional officer in the process, and had pleaded guilty to another recent escape from an Oregon jail. It was reasonable for the trial court to conclude that defendant presented a security risk that justified his shackling.

Defendant argues nonetheless that, even if the shackling was not erroneous, the court failed in its duty to ensure that the shackling was done in the least visible or obtrusive manner by removing the hand shackle. As we stated in *People* v. *Duran* (1976) 16 Cal.3d 282, 291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]: "[I]n any case where physical restraints are used those restraints should be as unobtrusive as possible, although as effective as necessary under the circumstances." We recognized that "shackles or manacles are not easily hidden from the jury's view and [we] do not wish to imply that they should not be used simply because they are obtrusive." (*Id.* at p. 291, fn. 9.) We then noted that "less drastic and less visible restraints should be employed when, in the exercise of his discretion, the judge concludes it is safe to do so." (*Ibid.*) It does not appear from the present record, in light of defendant's escape history and violence against correctional personnel, that the trial court abused its discretion in ordering the hand shackling.

## I. *Admission of Photographs*

The prosecution sought to admit 11 photographs of the victim, over defendant's objection. It subsequently withdrew all but four of the photographs, including an autopsy photograph. The trial court denied admission of the autopsy photograph, but admitted into evidence three postmortem photographs over the objections of Niles's counsel. These photographs showed Sonja Niles's corpse and the remains of a large mass of brain matter beside

raise these objections to the admission of evidence below, he may not raise them on appeal. (*People* v. *Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330].)

her arm, which had been expelled from her skull by the force of the shotgun blast that killed her. The prosecution used these photographs in connection with its direct examination of the pathologist on the cause and circumstance of the death. Defendant now contends that the trial court erred in admitting these photographs; he claims that they inflamed the jury's passions, and that their prejudicial effect outweighed their probative value and should not, under Evidence Code section 352, have been admitted into evidence.

The photographs were relevant primarily because they refuted defendant's statement to the police, subsequently admitted into evidence, that he had not killed Sonja Niles but had been a mere bystander. In that statement he claimed that the victim had been lying on the ground when Niles shot her, and that he, defendant, had been standing in front of her. He also claimed that the blood and brain matter on his pants, which were later discovered by the police, were from their forward propulsion by the shotgun blast. But the photographs show that Sonja Niles, with the brain matter lying beneath her arm, could not have in fact been lying down at the time she was murdered, but was in an upright position, thereby undermining the credibility of defendant's statement.

Defendant claims that the pathologist's testimony and his own stipulations would have conveyed to the jury the information contained in the photographs. But " '[t]he prosecution was not obliged to prove these details solely from the testimony of live witnesses, and the jury was entitled to see how the physical details of the scene and body supported the prosecution theory.' " (*People* v. *Raley* (1992) 2 Cal.4th 870, 897 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Moreover, the record reveals that the court clearly engaged in the process of weighing the probative value and prejudicial effect of the evidence, and on that basis excluded the autopsy photograph. (See *ibid.*) Thus, although the photographs were indeed gruesome, they had considerable probative value in refuting defendant's exculpatory version of events, and the trial court committed no abuse of discretion in admitting them into evidence.[7]

Defendant also raises a number of federal and state constitutional claims in connection with the admission of the photographic evidence. These claims are merely recharacterizations in constitutional form of his Evidence Code section 352 claim discussed above, and must therefore also fail.

---

[7]Codefendant Niles moved to have the photographs converted to black and white in order to diminish their prejudicial impact. On appeal, defendant contends that the trial court erred in denying the motion. We disagree. Evidence Code section 352 imposes no duty on the trial court to order the alteration of relevant photographic evidence so as to lessen potential prejudice.

## J. *Admissibility of Other Evidence*

The pathologist testifying for the prosecution, Dr. Hunter, used a styrofoam head to illustrate the trajectory of the shotgun blast that killed Sonja Niles. He illustrated the bullet's path for the jury by using a wooden probe, and showed that the bullet traveled from the back of the head to the front in a slightly upward direction. Dr. Hunter's testimony was relevant to show that Sonja Niles was standing when she was shot, thereby refuting, as explained above, defendant's contrary statement. Defendant did not object to the use of the styrofoam model. On appeal, however, he contends the use of the model, and particularly the use of the probe to illustrate the nature of the head wound, was an overly graphic depiction of the victim's injury and therefore prejudicial—a prejudice outweighing whatever probative value such an illustration may have had. Because he failed to object, his claim of error is waived.

Defendant further claims ineffective assistance of counsel for counsel's failure to object to the use of the model. ▮▮ A defendant seeking to establish ineffective assistance must show both a deficient performance on the part of counsel, and a reasonable probability that such performance adversely affected the verdict. (*People* v. *Hawkins*, *supra*, 10 Cal.4th at p. 940.) No ineffective assistance appears. We can discern no undue prejudice in the use of the styrofoam model, and no deficient performance on trial counsel's part for failure to object to such use.[8]

▮▮ During trial, defendant was also asked to stand beside the bloody khaki pants that the police had discovered in his apartment, as was codefendant Niles, to prove that these pants fit defendant and not Niles. Norma Clark, who had witnessed the man who was believed to be Sonja Niles's murderer flee the scene, had reported that he wore light-colored pants, and the prosecution sought to establish that it was defendant rather than Niles who wore those pants on the night of the murder. Defendant objected that the prejudicial impact of showing him beside the bloodstained pants outweighed any probative value under Evidence Code section 352, but the trial court allowed the demonstration.

On appeal, defendant claimed that the trial court abused its discretion in permitting him to be shown alongside the pants. Specifically, he contends that the fact that he owned the pants was not in dispute and that therefore the

---

[8]Defendant claims that the use of the styrofoam head violated several federal and state constitutional rights. Because defendant failed to make these objections at trial, they are waived. (*People* v. *Benson*, *supra*, 52 Cal.3d at pp. 786-787, fn. 7.) Moreover, his claims are nothing more than a redesignation of his assertion that the prejudicial effect of using the model head and probe exceeded its probative value, which we reject.

demonstration had little probative value. The record below, however, reveals no stipulation on his part that the pants fit him and not Niles, and that question remained important in showing that it was he, not Niles, who actually killed Sonja Niles. Moreover, the trial court, upon examining the pants, concluded that they were not so grossly discolored as to prejudice the jury. We conclude that the trial court did not abuse its discretion in permitting him to be seen alongside the pants.

### K. *Refusal to Admit Niles's Extrajudicial Statements*

 Defendant requested the admission of several of Niles's out-of-court statements. The prosecution opposed the request, seeking to have these statements heard by Niles's jury alone. The trial court refused the request on the grounds that they were inadmissible hearsay, not within any exception. He now claims that the trial court committed prejudicial error in so ruling. We disagree. As will appear below, although the trial court may have erred in completely excluding these statements, no prejudice resulted.

Niles initially telephoned the police from Los Angeles shortly after the murder. He professed to be worried about his wife, who he said he had left at home before driving to Los Angeles. He told the police he had called her on arriving in Los Angeles, and had received no answer. He was told to report to the Corona Police Department for questioning. In his first taped interview, he essentially repeated the story he had given over the telephone. He also told the police that he had no reason to kill his wife, although he admitted to having had domestic quarrels. When confronted with the fact there was evidence that he and his wife had a physical altercation, he admitted to having a "push altercation," but stated that they had not fought within the last two months.

In a second taped interview made the afternoon after the murder, Niles conceded he had lied to the police in a previous interview, and offered an alternative account of events. He said that his wife owed defendant $100 for drugs, and defendant had been calling her about it in the previous weeks. Niles ran into defendant in Los Angeles after taking his wife to work. Defendant pulled out a sawed-off shotgun and forced Niles to drive him to the latter's home. Once there he demanded gold or money. Eventually defendant made Niles pick up his wife at work. Defendant met them on the street. He went "berserk" when he saw Sonja Niles in her correctional officer's uniform. She attempted to run from him and he killed her. Niles was in the car when the shooting occurred. Defendant then ordered Niles to drive him back to Los Angeles, after which Niles called the police.

In a third taped interview made three hours after the second interview, Niles again conceded that he had withheld the truth in certain respects. He

claimed that he had been parked a greater distance away than he had admitted in the second statement, and that defendant had announced his intention to rape Niles's wife. Niles was going to allow the rape to occur because of his fear for his own life. Defendant subsequently let Niles go only because Niles convinced defendant he would pay him.

At trial, defendant sought to have these statements admitted into evidence. The prosecution, after an initially noncommittal position, opposed the motion on the grounds that Niles's extrajudicial statements were inadmissible hearsay. Defendant argued, and argues on appeal, that the statements are admissible on essentially two grounds. First, that Niles's false and inconsistent statements could be used for the nonhearsay purpose of showing a consciousness of guilt. Second, some of the statements were against Niles's interest in subjecting him to criminal liability, and therefore an exception to the hearsay rule under Evidence Code section 1230. The trial court decided the motion in the prosecution's favor. Nonetheless, it allowed into evidence Niles's initial telephone call to the police.

We agree that at least some portions of Niles's statements could have been admitted into evidence for the nonhearsay purpose of demonstrating his initial attempts to conceal the truth and showing his consciousness of guilt. Any error the trial court made in this regard cannot be prejudicial, however, under any standard of review. The prosecution's theory of the case was not that Niles was not involved in the murder—on the contrary, the prosecution sought to prove that Niles hired defendant, and that he drove the getaway car. Niles's prior recorded statements are fully consistent with this theory. Niles told lies and half-truths in order to conceal his central involvement in his wife's murder and shift blame to defendant. Nothing in these statements, whether taken at face value or to prove Niles's lack of credibility, weakens in any manner the prosecution's case against defendant—that it was defendant who actually fired the shotgun that killed Sonja Niles. It was not Niles's testimony, but that of Piper and Clark as well as the physical evidence found in defendant's apartment, that primarily pointed to defendant as Sonja Niles's murderer. Moreover, the admission of the telephone call recording from Niles made amply clear to the jury that Niles was attempting to conceal his culpability from the police. For these reasons, failure to admit the other recorded statements, to the extent it was error, was harmless.[9]

## L. *Discovery of Police Personnel Records*

Prior to trial, codefendant Niles filed a motion pursuant to Evidence Code sections 1043 through 1045 to discover citizen complaints

---

[9]Defendant also claims that he relied on the prosecution's initial lack of objection to the out-of-court statements in planning his defense strategy. Yet he shows no prejudice in such reliance and his claim is therefore without merit.

against the police officers who interrogated and arrested him, Detectives Stewart and Marmolejo. The trial court conducted an in camera hearing pursuant to Evidence Code section 1045, subdivision (b), and concluded that none of the citizens complaints in which these two officers were mentioned were sufficiently relevant to the present case. Defendant now contends that the trial court erred in refusing to permit discovery of any of these complaints.

As a threshold matter, the People contend that defendant did not join Niles on the discovery motion, and may therefore not claim error on appeal. Although defendant did not appear to formally join the motion, and defendant's counsel was absent when it was being argued, defendant expressed interest in the outcome of the motion, as he too challenged the voluntariness of the incriminating statements he had made to police. (See pt. III.B., *ante.*) We need not decide, however, whether defendant can be deemed to have joined the discovery motion so as to preserve the issue on appeal. Assuming that he did, we nonetheless conclude that the trial court did not err in not providing discovery of the citizen complaints in question.

 Evidence Code sections 1043 through 1045 codify *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]. "The statutory scheme carefully balances two directly conflicting interests: the peace officer's just claim to confidentiality, and the criminal defendant's equally compelling interest in all information pertinent to the defense." (*City of San Jose* v. *Superior Court* (1993) 5 Cal.4th 47, 53 [19 Cal.Rptr.2d 73, 850 P.2d 621].) The legislation achieves this balance primarily through a procedure of in camera review, set forth in section 1045, subdivision (b), whereby the trial court can determine whether a police officer's personnel files contain any material relevant to the defense, with only a minimal breach in the confidentiality of that file.

 In the present case, Niles requested discovery of citizens complaints regarding unnecessary and excessive force, acts demonstrating racial prejudice, and those regarding coercive interrogation techniques. But when a defendant asserts that his confession was coerced, a discovery request that seeks all excessive force complaints against the arresting officers is overly broad. (*People* v. *Memro* (1985) 38 Cal.3d 658, 685 [214 Cal.Rptr. 832, 700 P.2d 446].) "Since [defendant] sought the information to bolster his claim of involuntariness in the interrogation setting, only complaints by persons who alleged coercive techniques in questioning were relevant." (*Ibid.*) The trial court properly narrowed its inquiry to such complaints and found nothing relevant in either personnel file.

 A trial court's decision on the discoverability of material in police personnel files is reviewable under an abuse of discretion standard. (*People*

v. *Breaux* (1991) 1 Cal.4th 281, 311-312 [3 Cal.Rptr.2d 81, 821 P.2d 585].)
 Our review of the record reveals that there were no complaints against Stewart and Marmolejo regarding coerced confessions, and that the trial court therefore did not abuse its discretion in denying defendant's discovery request.[10]

### M. *Ineffective Assistance of Counsel for Failure to Argue Withdrawal*

 During closing argument, defense counsel argued at length that although defendant had conspired to kill Sonja Niles, he withdrew from the conspiracy when he discovered that she was a correctional officer, and that it was Niles who killed her. He never argued explicitly that defendant had withdrawn as an aider and abettor of Niles. As defendant correctly points out on appeal, in order to withdraw as an aider and abettor, he would have had to have done more than is required in a withdrawal from a conspiracy. In the latter case, "one need only make an affirmative repudiation communicated to his coconspirators." (*People* v. *Belmontes* (1988) 45 Cal.3d 744, 793 [248 Cal.Rptr. 126, 755 P.2d 310].) In the former case, a defendant would have to notify his accomplices and have "done everything in his power to prevent commission of the crime." (*Ibid.*) Defendant argues that counsel rendered ineffective assistance by arguing to the jury that defendant withdrew from the conspiracy, but failing to argue that he withdrew as an aider and abettor—specifically, by failing to argue that he had done everything in his power to prevent commission of the crime.

 We need not decide whether counsel rendered deficient performance from failing to argue withdrawal as an aider and abettor, for it is clear that no prejudice resulted. The jury found defendant to be the direct perpetrator, and not mere aider and abettor, by finding that he had personally used the firearm within the meaning of section 12022.5. Therefore, no prejudice resulted from the failure to argue against aider and abettor liability.[11]

---

[10]In conducting review of the trial court's *Pitchess* determination, we reviewed the sealed record of the in camera proceeding, but not the personnel documents themselves. According to a representative of the Corona Police Department at a 1993 hearing held at our direction, these personnel records have been destroyed, in accordance with the department's policy of destroying citizens complaints more than five years old against police officers. (See Evid. Code, § 1045, subd. (b)(1) [defendant not entitled to complaints more than five years old].) Defendant does not show bad faith in the destruction of these records, and therefore no constitutional error appears. (*Arizona* v. *Youngblood* (1988) 488 U.S. 51, 58 [102 L.Ed.2d 281, 289-290, 109 S.Ct. 333]; *People* v. *Memro* (1995) 11 Cal.4th 786, 831 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

[11]Defendant claims that the instruction on personal use of a firearm was not sufficient to inform the jury that it could not make a personal use finding based on an aider and abettor's vicarious liability for the principal's use of the firearm. But the instruction given to the jury,

### N. *Failure to Give a Manslaughter Instruction*

The jury was instructed on first and second degree murder. Defendant requested a voluntary manslaughter instruction. His theory in support of the instruction was as follows. According to his statement, as well as the statement of Niles's son, there was an altercation between Niles and his wife shortly before the killing. Defendant contends that it would have been possible for the jury to believe that Niles killed his wife in a fit of rage, for which he could have been convicted of voluntary manslaughter. Inasmuch as the jury believed defendant to have been liable as an aider and abettor, they would have convicted him as an aider and abettor to manslaughter. The trial court refused the instruction, which defendant contends was prejudicial error.

Defendant's claim of prejudicial error has at least one obvious flaw. The failure to give a voluntary manslaughter instruction could only be prejudicial to defendant if there was some possibility that the jury believed defendant guilty on an aider and abettor theory. There is no evidence, and defendant does not contend, that he could have been found guilty of voluntary manslaughter as a principal. But, as explained in part III.M. of this opinion, *ante*, the jury plainly rejected the aider and abettor theory, finding that defendant personally used a firearm to kill Sonja Niles. Therefore, we must reject defendant's claim of prejudicial error for failure to give a voluntary manslaughter instruction.

### O. *Multiple Consciousness of Guilt Instructions*

Defendant and the People requested several "consciousness-of-guilt" instructions, namely CALJIC Nos. 2.03, 2.04 and 2.52,[12] which the trial court gave. The trial court also instructed the jury according to CALJIC

---

CALJIC former No. 17.19 (5th ed. 1988 bound vol.), which defines the term "use" of a firearm as a "display . . . in a menacing manner, intentionally to fire it, or intentionally to strike or hit a human being with it," is not reasonably susceptible to defendant's interpretation. Indeed, to construe the instruction to include vicarious liability for firearm use would render the instruction meaningless, something we must presume a reasonable juror would not do.

[12]CALJIC No. 2.03, as given to the jury, provides: "If you find that before this trial [the] defendant made wilfully false or deliberately misleading statements concerning the charge upon which he is now being tried, you may consider such statements as a circumstance tending to prove a consciousness of guilt but it is not sufficient of itself to prove guilt. The weight to be given to such a circumstance and its significance, if any, are matters for your determination."

CALJIC No. 2.04 provides: "If you find that a defendant [attempted to] persuade a witness to testify falsely or [tried] to fabricate evidence to be produced at the trial, such conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your determination."

No. 2.06[13] at the People's request and over defendant's objection. On appeal, defendant now contends that these four instructions were given in error for various reasons.

■ As a preliminary matter, defendant joined in requesting three of the consciousness-of-guilt instructions. The claims of error are therefore waived with regard to them. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 152 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Nor does defendant's claim on appeal that counsel rendered ineffective assistance by not objecting to these instructions have merit. Counsel could have reasonably concluded that these instructions would highlight evidence of *Niles*'s consciousness of guilt, since Niles lied to the police, fabricated a story of his wife's murder, and fled his home for Los Angeles after the murder. This in turn could have in some measure furthered the defense strategy of showing Niles to be the murderer. Therefore, defense counsels' performance in requesting these instructions cannot be said to be deficient.

■ Moreover, no error was committed in giving these instructions. Defendant has essentially three objections to the instructions. None have merit.

First, defendant claims that each of these instructions was an impermissible "pinpoint" instruction that violated his right to due process by lessening the prosecution's burden of proof. In *People* v. *Wright* (1988) 45 Cal.3d 1126 [248 Cal.Rptr. 600, 755 P.2d 1049], we distinguished between instructions which properly " 'pinpoint[] the theory of the defense' " and those which "improperly impl[y] certain conclusions from specified evidence . . . ." (*Id.* at p. 1137.) In that case we gave as an example of the former an alibi instruction which directs the jury to acquit a defendant if it believed him not to be present at the time the crime was committed. (See CALJIC No. 4.50.) We thus approved of *People* v. *Wilson* (1929) 100 Cal.App. 428 [280 P. 169], in which the court reversed the conviction of a robbery defendant who put on an alibi defense and was refused an alibi instruction. (*Wright*, *supra*, 45 Cal.3d at p. 1137.) On the other hand, we disapproved as "argumentative" the instruction requested by the defendant in *Wright*, which

---

CALJIC No. 2.52 provides: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved ·facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

[13]CALJIC 2.06 provides: "If you find that a defendant attempted to suppress evidence against himself in any manner, such as [by concealing evidence] such attempts may be considered by you as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration."

would have instructed the jury to "consider" various pieces of evidence, such as the fact that all the robbers wore ski masks, in assessing the defendant's guilt. (*Id.* at p. 1138.)

In the present case, each of the four instructions made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. (See *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1235 [14 Cal.Rptr.2d 702, 842 P.2d 1] [CALJIC No. 2.06 is of benefit to defense and not improper]; *People* v. *Kelly* (1992) 1 Cal.4th 495, 531-532 [3 Cal.Rptr.2d 677, 822 P.2d 385] [same with respect to CALJIC No. 2.03].) We therefore conclude that these consciousness-of-guilt instructions did not improperly endorse the prosecution's theory or lessen its burden of proof.

Defendant next contends that the trial court should have modified these instructions sua sponte to clarify to the jury that a defendant's deceptive or evasive behavior, while it may indicate consciousness of guilt, is not probative of the defendant's state of mind at the time the crime was committed, and therefore cannot be used to determine the degree of murder for which defendant was culpable. The failure to so limit these instructions, he claims, violates his federal and state due process rights. He further contends that counsel rendered ineffective assistance in failing to request such an instruction. We reject these contentions. As we stated in *People* v. *Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423], with respect to CALJIC Nos. 2.03 and 2.06: "The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard hereto." We therefore conclude that no limiting instructions were warranted, and no violation of due process or ineffective assistance of counsel results from the failure to administer or request such instructions.

Finally, although defendant appears to concede that there was sufficient evidence to warrant instructing the jury in accordance with CALJIC No. 2.03, he argues that the evidence was insufficient with regard to the other three instructions.

CALJIC No. 2.04 instructs that the jury may infer consciousness of guilt "if you find that a defendant attempted to or did persuade a witness to testify falsely or tried to fabricate evidence to be produced at the trial . . . ." The

People contend, as they did at trial, that defendant's attempt to construct an alibi when first questioned by police—stating that he was out with friends at the night of the murder and returned home at 10 p.m.—was an attempt at fabricating evidence within the meaning of this instruction. Defendant argues that CALJIC No. 2.04 is inapplicable because it "is limited to situations where a defendant attempts to induce a witness to lie for him in a judicial proceeding or otherwise tries to fabricate evidence when a trial or prosecution is pending." We agree that the language of the instruction, and particularly the phrase "evidence to be produced at trial," suggests such a limitation. (See, e.g., *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 96-97 [270 Cal.Rptr. 817, 793 P.2d 23] [defendant's fabrication of certain fictional first person narratives purporting to show his innocence while in prison awaiting trial warrants a CALJIC No. 2.04 instruction].) The manufacture of an alibi before defendant is charged with a crime is more appropriately addressed by CALJIC No. 2.03, concerning a defendant's "wilfully false or deliberately misleading statements concerning the charge on which he is now being tried."

Nonetheless, as stated above, defendant requested the instruction, and any objection to it is waived on appeal. Even if that were not so, however, we conclude that the error in administering CALJIC No. 2.04 was harmless under any standard. As we stated in *People* v. *Pride, supra,* 3 Cal.4th at page 249, when considering possible error in giving the same instruction: "[A]t worst, there was no evidence to support the instruction and . . . it was superfluous. As previously explained, evidence of defendant's guilt was strong. Under the circumstances, reversal on such a minor, tangential point is not warranted."

Defendant also contends that the instruction in CALJIC No. 2.06, to which he objected, was not warranted by the evidence. We disagree. That instruction states that consciousness of guilt can be inferred from a defendant's attempt to "suppress evidence against himself in any manner, such as by concealing evidence." Defendant, when originally questioned by police, denied that the gun used to murder Sonja Niles was in his room. The trial court did not err in concluding that such a response on defendant's part was an attempt to "suppress evidence against himself" and that therefore the furnishing of a CALJIC No. 2.06 instruction was proper. The fact that defendant's attempted concealment of the gun also qualifies as a "false or deliberately misleading statement" under CALJIC No. 2.03 is of no significance. The latter instruction concerns a broad class of deceptive statements, while the former concerns a narrower but overlapping category of particularly telling deceptions. There is no reason why a false statement designed to conceal inculpatory evidence cannot be the basis for giving both of these instructions.

Finally, defendant argues that there was no evidence supporting a CALJIC No. 2.52 instruction. That instruction states that the jury may consider a defendant's flight "after the commission of the crime or after he is accused of a crime" as one factor in determining defendant's culpability. Defendant contends that there was no evidence of flight—that the mere fact that he drove back to his home with Niles from Corona, his sole source of transportation, was not evidence of flight. The evidence shows, however, not only that defendant drove back with Niles, but, according to Clark's eyewitness testimony, that he ran from the scene of the murder down the street to the car. The jury was entitled to reasonably infer defendant's guilt from such flight. We therefore conclude the court did not err in furnishing CALJIC No. 2.52.[14]

### P. Adequacy of Reasonable Doubt Instruction

Defendant contends that it was prejudicial constitutional error under the Fifth, Sixth, and Fourteenth Amendments of the federal Constitution and their California equivalents to instruct the jury in accordance with CALJIC No. 2.90, which explains the meaning of reasonable doubt. He argues that the use of such terms as "moral evidence," "abiding conviction," and "moral certainty" were ambiguous, and rendered the instruction incomprehensible to the average juror. We have repeatedly rejected the claim (see, e.g., *People* v. *Hawkins, supra,* 10 Cal.4th at pp. 954-955) and decline to reconsider it here.

### Q. Use of Special Findings

Defendant's jury was asked to make three special findings on the three acts which the prosecution asserted were in furtherance of the murder conspiracy with which he was charged. The jury found that defendant had committed all three acts. The jury also rendered a general verdict on the conspiracy count, finding defendant guilty. Defendant now contends that the use of the special findings form violates sections 1150 and 1152, which provide that a superior court jury must render a general verdict except when it is "in doubt as to the legal effect of the facts proved." (§ 1150.) In such cases, the jury may render a special verdict, "find[ing] the facts only, leaving the judgment to the court." (§ 1152.) Defendant claims that the special findings converted the conspiracy verdict into a special verdict, in violation of these statutes. He also contends that the use of the special verdict violated his right to due process and trial by jury under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and their California equivalents.

---

[14]Defendant also raises various state and Federal constitutional claims. We conclude that these claims, based as they are on the court's supposed prejudicial error in giving the four instructions discussed above, are without merit.

Defendant is mistaken that the jury's special findings constituted an improper special verdict, for the jury did not cede the ultimate judgment of his culpability to the trial court, but rendered a general verdict. Nor did the trial court require the jury to make the special findings before reaching a general verdict, a procedure we found troublesome in *People* v. *Perry* (1972) 7 Cal.3d 756, 783-784 [103 Cal.Rptr. 161, 499 P.2d 129]. (See also *People* v. *Farmer* (1989) 47 Cal.3d 888, 920 [254 Cal.Rptr. 508, 765 P.2d 940].) Here, the use of special findings was a proper safeguard of defendant's right of due process, ensuring that the jury deliberating on a conspiracy charge agree unanimously on the same overt act or acts that are the basis of his culpability. (See *People* v. *Davenport* (1985) 41 Cal.3d 247, 274 [221 Cal.Rptr. 794, 710 P.2d 861].)[15] We find no error under sections 1150 and 1152. We further conclude that the use of such findings in conjunction with a general verdict did not violate defendant's federal or state constitutional rights to due process or a fair trial.

## IV. SPECIAL CIRCUMSTANCES

### A. *Admission of Evidence of Niles's Insurance Coverage*

The jury found true the special circumstance that defendant's murder of Sonja Niles was "intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) As part of the proof of defendant's and Niles's motive, the prosecution introduced into evidence testimony and documents showing that Niles was the beneficiary of his wife's insurance policy and was eligible to receive $100,000 on her death. Niles objected on the grounds that this evidence was hearsay and lacked appropriate foundation, and defendant joined in the objection. Defendant now contends that such evidence was irrelevant to prove motive, that admission of such evidence was unlawful hearsay, and that it violated the best evidence rule. Specifically, defendant contends that the testimony of Nancy O'Connell, an employee of the CCPOA, was not based on a valid business record and therefore not within the business record exception to the hearsay rule (Evid. Code, § 1271), because she did not possess a copy of the victim's insurance policy, but merely a copy of her application for insurance in the CCPOA files, which proved only that the victim applied for insurance. Defendant further contends that the verification of payments to the insurance company contained in the victim's file did not fall within the business records exception

---

[15]While recognizing that special findings may be used to secure jury unanimity on a defendant's commission of overt acts in connection with a conspiracy, we take no position on the question whether a defendant *is entitled* to a unanimity instruction in a conspiracy trial. (Compare *People* v. *Godinez* (1993) 17 Cal.App.4th 1363, 1367 [22 Cal.Rptr.2d 164] with *People* v. *Ramirez* (1987) 189 Cal.App.3d 603, 611-613 [233 Cal.Rptr. 645].)

to the hearsay rule either, because O'Connell lacked any personal knowledge of the transaction. (See *People* v. *Shirley* (1978) 78 Cal.App.3d 424, 438 [144 Cal.Rptr. 282].)

Although we disagree with defendant that such evidence was irrelevant, we recognize that it was at most tangential to proving *defendant's* motive, and was more pertinent to prove that of codefendant Niles. For this reason, the admission of the insurance policy evidence, even if in error, was not prejudicial to defendant. The evidence that defendant had committed the murder for financial gain was based chiefly on other evidence: Piper testified to Niles's offer of $5,000 for the murder of Sonja Niles, and defendant made extrajudicial statements introduced into evidence attesting to Niles's offer to pay him for his wife's murder. Moreover, defendant and Sonja Niles were strangers, and there was no evidence that he murdered her for any reason other than financial gain. Therefore, even if evidence of Niles's insurance coverage was improperly admitted—a question we do not reach—its admission was harmless to the jury's special circumstance determination against defendant under any standard of prejudice.[16]

## B. *The Financial Gain Instruction*

 The jury was instructed in accordance with a modified version of CALJIC No. 8.81.1. That instruction provided: "To find that the special circumstance, referred to in these instructions as murder for financial gain, is true, each of the following facts must be proved: [¶] (1) That the murder was intentional; [¶] (2) That it was carried out for financial gain; and [¶] (3) That defendant believe the death of the victim will result in the desired financial gain." Defendant now contends that it was error not to instruct the jury that if it found a mixed motive for the killing it must find the special circumstance untrue. Defendant contends that because the jury could have found defendant guilty of first degree murder on an aider and abettor theory, and since Niles may have had a mixed motivation for murdering his wife which would be imputed to defendant as an aider and abettor, defendant should have received an instruction on mixed motivation. Defendant contends that the failure to furnish such an instruction violated his due process rights under the Fifth, Eighth and Fourteenth Amendments of the United States Constitution and their California equivalents.

As a preliminary matter, defendant failed to request an instruction on mixed motivation at trial, and therefore waives the issue on appeal. (*People*

---

[16]Defendant also contends there was federal or state constitutional error in the admission of insurance coverage evidence. Defendant failed to raise the claims at trial, and they are waived on appeal. (*People* v. *Benson, supra*, 52 Cal.3d at pp. 786-787, fn. 7.) We further find on the merits that no constitutional error appears.

v. *Bell, supra,* 49 Cal.3d at p. 550 [defendants have responsibility to request modification of instructions they find incomplete].) Further, we have rejected the claim "that the unadorned language of the financial-gain special-circumstance instruction was flawed because it failed to convey to the jury any requirement that financial gain be the 'direct' or 'motivating cause' of the murder." (*People* v. *Noguera* (1992) 4 Cal.4th 599, 635 [15 Cal.Rptr.2d 400, 842 P.2d 1160].) Similarly, we reject the proposition that the jury must be instructed that the murder had to be carried out exclusively for financial gain in order for it to qualify under section 190.2, subdivision (a)(1). CALJIC No. 8.81.1 accurately reflects the mandate of the special circumstances provision that anyone who intentionally commits murder for purposes of financial gain should be eligible for the death penalty or life imprisonment without possibility of parole. No instructional error was committed.

## V. PENALTY PHASE

### A. *Testimony of Defendant's Rape Victim*

At the commencement of the penalty phase the prosecution indicated that one of the penalty phase witnesses it intended to call was Shelley P., whom defendant had raped in Oregon after having escaped from Riverside County jail, where he was awaiting trial on the present murder charge. Defendant offered to stipulate to Shelley P.'s account of the incident so that she would not testify. The prosecution refused defendant's stipulation and the court declined to compel the State to accept it. Defendant now contends that the trial court erred and deprived him of his rights to due process and a reliable sentencing determination under the Fifth, Sixth, Eighth, and Fourteenth Amendment of the United States Constitution and their equivalents under the California Constitution.

We rejected an almost identical claim in *People* v. *Karis* (1988) 46 Cal.3d 612, 638-641 [250 Cal.Rptr. 659, 758 P.2d 1189]. In that case the defendant had offered to stipulate that he had committed a rape with force and violence; to the " 'factual basis surrounding that rape' "; and to statements given to police officers by the witnesses to the defense. (*Id.* at p. 638.) In distinguishing the case from *People* v. *Hall* (1980) 28 Cal.3d 143, 152 [167 Cal.Rptr. 844, 616 P.2d 826], in which the defendant offered to stipulate to a status as an ex-felon—an element of the offense with which he was charged—we stated: "The purpose of introducing evidence of prior convictions as aggravating factors at the penalty phase of a capital case is not comparable to proving ex-felon status an element of a criminal offense. A penalty phase jury is not simply making factual findings leading to a

determination of guilt. In weighing the appropriate penalty, deciding between death and life imprisonment without possibility of parole, the jury performs a normative function, applying the values of the community to the decision after considering the circumstances of the offense and character and record of the defendant. [Citations.] [¶] The evidence which the People sought to introduce was not only the fact of defendant's prior convictions or the nature of the offenses, evidence that may come under section 190.3, factor (c), but also the fact that these offenses were violent assaultive crimes. In enacting factor (b) of section 190.3, the electorate intended to allow admission of evidence of violent criminal acts, not simply the fact of prior felony convictions. [Citations.] Reading to the penalty phase jury the victims' and witnesses' descriptions of a crime is not an adequate substitute for testimony during which the prosecutor may elicit the details he believes to be particularly relevant to the penalty decision." (*Karis, supra,* 46 Cal.3d at pp. 639-640.)

Similarly in the present case, defendant's stipulations were not an adequate substitute for the victim's testimony, and the trial court did not abuse its discretion in concluding that the latter was relevant to the jury's task of assessing the degree of defendant's culpability at the penalty phase.

Defendant requested that the jury be informed that he had offered to stipulate to the rape of Shelley P. Defendant argued at trial, and now contends, that the offer of stipulation reflected positively on his character, inasmuch as it was intended to relieve his rape victim of the burden of having to relive the crime on the witness stand. The trial court refused to so inform the jury and defendant now claims error.

A defendant has the "right to place before the sentencer relevant evidence in mitigation of punishment." (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669].) This includes " ' "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' " (*Id.* at p. 4 [90 L.Ed.2d at p. 6].) In the present case the trial court was well within its discretion in concluding that defendant's offer of stipulation did not reflect on his good character but was more likely a self-serving attempt to lessen the impact of the rape evidence, and that therefore evidence of defendant's proffered stipulation was not "relevant evidence in mitigation of punishment" (*Ibid.*)

### B. *Videotaping of Shelley P.'s Testimony*

On the day that Shelley P. was to testify, the prosecution requested that her testimony be videotaped. It explained that she was a college student

in Oregon who, unlike the other witnesses local to Southern California, might prove difficult to locate in the event of a retrial. Defendant objected, arguing that the videotaping of this witness alone would inevitably be the subject of notice and speculation by the jury and would unduly highlight her testimony. The trial court permitted the videotaping. Defendant now contends that the trial court violated the California Rules of Court, rule 980 in permitting the videotaping.

Rule 980 provides that a request for "[f]ilm or electronic media coverage" be filed "a reasonable time before the portion of the proceeding to be covered." (Cal. Rules of Court, rule 980(b)(1).) Defendant contends that the prosecution failed to provide reasonable notice of the videotaping. But the above quoted portions of rule 980 pertain to *media* coverage, which is defined in rule 980 to mean "recording or broadcasting of court proceedings by the media using television, radio, photographic, or recording equipment." In the present case the videotaping was done not for the purpose of media broadcasting, but for preserving evidence, and therefore falls within subdivision (d) of rule 980 which provides: "Any other photographing, recording, or broadcasting of court proceedings is prohibited unless specifically authorized by the court." In the present case the videotaping was authorized by the court and therefore did not violate rule 980.

Furthermore, defendant has the burden of demonstrating specific prejudice resulting from the presence of a camera in the courtroom. (*Chandler* v. *Florida* (1981) 449 U.S. 560, 581-582 [66L.Ed.2d 740, 755-756, 101 S.Ct. 802]; *People* v. *Spring* (1984) 153 Cal.App.3d 1199, 1207-1208 [200 Cal.Rptr. 849].) Defendant has demonstrated no such prejudice here.[17]

### C. *Evidence of Nonviolent Escape*

At trial, defendant objected to the admission of evidence of his escape from a jail in Oregon in January of 1988. He asserted that the escape involved violence to property, not to persons, and therefore did not fit within the meaning of "force or violence" as set forth in section 190.3, factor (b). The prosecutor argued to the contrary that factor (b) permits admission of violent acts against property. The trial court ruled in the People's favor. Defendant now contends that the court erred in permitting such evidence to be admitted because it was not "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or

---

[17]Defendant raises claims of constitutional error based on several provisions of the federal and California Constitutions. He did not make any constitutional objection at trial to the presence of a camera in the courtroom, and any claim of error is therefore waived on appeal. (See *People* v. *Benson, supra,* 52 Cal.3d at pp. 786-787, fn. 7.) In any event, he demonstrates no constitutional error.

implied threat to use force or violence." (§ 190.3, factor (b); see also *People v. Boyd* (1985) 38 Cal.3d 762, 776-777 [215 Cal.Rptr. 1, 700 P.2d 782].)

Assuming, without deciding, that the trial court erred in admitting the Oregon escape, we conclude that such error was not prejudicial. **(39)** State law error occurring during the penalty phase will be considered prejudicial when there is a " 'reasonable possibility' such an error affected a verdict." (*People v. Brown* (1988) 46 Cal.3d 432, 447 [250 Cal.Rptr. 604, 758 P.2d 1135].) "In deciding whether it is 'reasonably possible' that a given error or combination of errors affected a verdict, we will 'exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker . . . . The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.' [Citation.] We therefore emphasize that a 'mere' or 'technical' possibility that an error might have affected a verdict will not trigger reversal. Instead, when faced with penalty phase error not amounting to a federal constitutional violation, we will affirm the judgment unless we conclude there is a reasonable (i.e., realistic) possibility that the jury would have rendered a different verdict had the error or errors not occurred." (*People v. Brown, supra*, 46 Cal.3d at p. 448.)

 We note generally that "erroneous admission of escape evidence may weigh heavily in the jury's determination of penalty." (*People v. Gallego* (1990) 52 Cal.3d 115, 196 [276 Cal.Rptr. 679, 802 P.2d 169].) Defendant claims such prejudice occurred in this case. He points in particular to the arguments made by the prosecution that highlighted the inadmissible escape evidence during closing argument. Most prominently, the prosecutor stated at one point during his closing argument: "The best argument I believe the defense can give you, and I have touched on it briefly before, 'My client will die in prison, society will be safe.' That's the best argument. My response is this, ladies and gentlemen, look to the past, for it will be your future. Do not do anything out of spite, do not do anything out of vengeance, do it because it is right, do it because Noel Jackson earned it. No one seeks vengeance in this court. I do not ask for vengeance. I ask for justice. I ask for justice in light of the facts. . . . Noel Jackson escaped not once, but twice."

The prosecutor also stated, shortly before this: "Everything [defendant] does from [the date of the murder] . . . is nothing but a violent thumbing his nose at the community. . . . 'I'll have sex when I want. I'll steal when I want. And if I don't like it here, I'll escape when I want. What's the phase [*sic*]? 'History repeats itself.' In the case of Noel Jackson it sure does." Defendant argues that these prosecutorial remarks demonstrate the prejudicial manner in which the inadmissible escape evidence was used; it allowed

the prosecutor to depict him as a significant escape risk, thereby implanting in the minds of jurors the notion that the death penalty was the only means of protecting the public from his future dangerousness.

Although defendant's argument may be plausible in the abstract, it is ultimately unpersuasive under the facts of this case. When the inadmissible evidence is considered in light of the record as a whole, it cannot be deemed to be prejudicial, for several reasons.

First, there was already admissible evidence of one escape, from the Riverside County jail, in which defendant actively participated through the restraint and robbery of a jail guard. The evidence of the second nonviolent escape in this case is merely cumulative. It is highly unlikely defendant would have appeared as a significantly greater escape risk merely because, in addition to the Riverside escape, he took advantage of what was evidently the low security of a jail in rural Oregon by breaking a window and absconding. It is not reasonably possible, in other words, that the Oregon escape would have added appreciably to the jurors' estimation of defendant's future dangerousness.

Second, the escape evidence was not the principal focus of the prosecutor's argument. Rather, he argued primarily the heinous nature of the murder itself—the deliberate killing of a woman unknown to defendant, at point-blank range with a shotgun, for the promise of financial gain. The prosecutor also focused on the brutal rape of Shelley P. while defendant was at large on the murder charge after the Riverside escape. Thus, the jury confronted an unusually aggravated capital crime, plus valid evidence that defendant, having used force to flee the penal consequences of that crime, thereafter returned undeterred to further violent criminal conduct. Nor was the mitigating evidence—testimony from family members to defendant's good character and troubled childhood—particularly remarkable. On this record, there seems no reasonable possibility that defendant's second, nonviolent escape from a small-town Oregon jail so substantially influenced the jury's assessment of his character or his danger to the community so as to tip the penalty balance.

Third, whatever additional prejudice the Oregon escape may have had was countered by the remarks of both defense counsel and the trial court. As defense counsel stated during closing argument: "[The prosecutor] said something about history repeating itself. Once those bars slam behind Mr. Jackson, ladies and gentlemen, that is where he is going to remain. The prison system in California has barbed wires, it has gun towers. And the judge will instruct you that if you impose a sentence of life without

possibility of parole, that you must assume that that penalty will be carried out. Noel Jackson is not going to go free." And the jury was indeed instructed that "it is your duty to assume that whatever penalty you make a determination of is the proper and appropriate penalty and that it will be carried out . . . . If you decide that life in prison without the possibility of parole is the proper penalty, you must assume that that will be carried out." While such comments and instructions may not be sufficient in every case to counter the prejudicial effect of inadmissible escape evidence, they are sufficient in cases such as the present one, in which, as discussed above, the detrimental impact of the evidence is at most of a minor and cumulative nature.

We therefore conclude there was no reasonable possibility that the admission of the Oregon escape evidence whether or not error, affected the verdict.

### D. *Admission of Defendant's Convictions for Rape and Escape*

 During the prosecution's case at the penalty phase of the trial, Lieutenant Melvin Clements of the Ashland, Oregon Police Department testified that defendant had been charged with rape in the first degree, kidnapping in the first degree, escape and burglary. He also testified that defendant had pleaded guilty to the charges of rape and escape. The prosecution also introduced court records documenting the charges and his subsequent guilty pleas and convictions. Defendant now contends that the trial court committed prejudicial error in permitting the admission of this evidence to prove his prior violent criminal activity under section 190.3, factor (b).

With regard to the Oregon escape, we have concluded immediately above that admission of such evidence, even if error, was not prejudicial to defendant's case. Certainly the introduction of evidence of the fact of defendant's conviction for the Oregon escape does not alter our prejudice analysis.

As for the introduction of evidence of conviction for rape, no error occurred. As a majority of this court has recently concluded: "[T]he prosecution may rely upon a prior *conviction* of a crime involving the use or threat of force or violence to establish the presence of criminal activity involving the use or threat of force or violence for purposes of section 190.3, factor (b)." (*People v. Ray* (1996) 13 Cal.4th 313, 369 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J.), italics in original.)

*Finally, we agree that the prosecution's admission of charges of crimes of which defendant was not convicted was error. (People v. Kaurish* (1991) 52

Cal.3d 648, 703 [276 Cal.Rptr. 788, 802 P.2d 278].) In addition to the charges of rape and escape, defendant was charged with kidnapping in connection with the rape of Shelley P., and with burglary. In light of the victim's testimony as to the circumstances of the rape, there is no reasonable possibility that evidence of the fact of being charged with kidnapping Shelley P. would have been prejudicial. Nor is there a reasonable possibility that the fact of being charged with an unspecified burglary could have prejudiced defendant.

### E. *Evidence of Defendant's Gun Possession*

When defendant was apprehended in Oregon in January of 1988 after the rape of Shelley P., his motel room was searched, and a loaded .38-caliber revolver was discovered in his suitcase. At the penalty phase, the prosecution introduced testimony from a police detective regarding the discovery of the loaded gun, and introduced the gun and bullets themselves into evidence. Defendant now contends that this evidence was inadmissible under section 190.3, factor (b).

At the threshold, defendant's claim is barred because he did not make a timely objection below to the admission of the evidence in question. (*People v. Harris, supra,* 47 Cal.3d at p. 1089.)

Defendant's claim also fails on the merits. As explained above, section 190.3, factor (b) permits the jury to consider the presence or absence of defendant's violent criminal activity in making its penalty determination. Defendant, as an ex-felon, committed a felony by possessing a concealable firearm (§ 12021). Such firearm possession is not, in every circumstance, an act committed with actual or implied force or violence. (See, e.g., *People v. Dyer* (1988) 45 Cal.3d 26, 76 [246 Cal.Rptr. 209, 753 P.2d 1].) The People assert, nonetheless, that given the factual circumstances surrounding the possession, i.e., the fact that defendant was an escaped prisoner fleeing from a murder charge at the time he was discovered with a gun, the possession can be said, at the very least, to have been undertaken with an implied threat of force or violence, and therefore admissible.

The People are correct. "It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible . . . . Such conduct is unlawful and involves an implied threat of force or violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142].) Similarly, a defendant who arms himself after having escaped from custody can be presumed to be in

possession of the gun to assist his continued flight rather than for legitimate self-defense or some other lawful purpose. Possession under these circumstances amounts to "substantial evidence of an implied threat of violence" admissible under section 190.3. (4 Cal.4th at p. 587.) The defendant was, of course, free to argue to the jury that the gun was secured for an innocent purpose. But the court committed no error in admitting such evidence.[18]

### F. Admission of Evidence of Defendant's Vehicle Code Section 10851 Conviction

█ Defendant pleaded guilty in 1984 to the offense of taking or driving an automobile without the consent of the owner. (Veh. Code, § 10851.) The conviction was for a felony. Defendant makes two claims of error on appeal.

First, defendant contends that his prior conviction under Vehicle Code section 10851 should not have been admitted because the municipal court that had accepted defendant's guilty plea failed to make an independent inquiry as to the factual basis of the plea. (§ 1192.5; see also *People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1576 [8 Cal.Rptr.2d 392].) █ "Section 1192.5 requires a trial court to determine by independent inquiry, before accepting a plea of guilty or nolo contendere to a felony offense, whether there exists a factual basis for the plea. The purpose behind the inquiry is to ' "protect against the situation where the defendant, although he realizes what he has done, is not sufficiently skilled in law to recognize that his acts do not constitute the offense with which he is charged." ' " (*People v. Wilkerson, supra*, 6 Cal.App.4th at p. 1576.) █ Defendant here contends that the court violated section 1192.5 by failing to make this independent inquiry, and instead accepted a bald stipulation from defense counsel as to the factual basis of defendant's plea.

Although defendant made an unspecified objection to the admission of his prior conviction "under section 190.3," he failed to object to its admission on grounds of the inadequacy of the guilty plea. His claim of error on those grounds is therefore waived on appeal. Moreover, even if there was error in the municipal court procedure that would invalidate the plea—a question we do not decide—there is no reasonable possibility that the jury would have been swayed in its penalty determination by the admission of a conviction

---

[18]Defendant also contends that the erroneous admission of the gun possession evidence violated his federal and state constitutional rights to a fair trial and a reliable determination of sentence. Defendant failed to raise these claims at trial, and they are therefore waived on appeal. (See *People v. Benson, supra*, 52 Cal.3d at pp. 786-787, fn. 7.) Moreover, because defendant's contentions are based on state law error, which we have rejected, they are without merit.

for a nonviolent automobile theft, given the gravity of defendant's capital crime and his other violent criminal activity.

Second, defendant contends that the prosecutor committed misconduct by mischaracterizing his conviction as one for "grand theft." The record shows that the prosecutor did, in fact, twice so mischaracterize defendant's offense—the crime for which he was originally charged before submitting to a guilty plea—including during closing argument. Defendant did not object, and his claim is therefore waived on appeal. (*People* v. *Harris, supra*, 47 Cal.3d at p. 1089.) Furthermore, there was no reasonable possibility that the prosecution's minor error would have affected the verdict.

### G. *The Examination of Defendant's Mother*

 As recounted above, defendant's mother, Bonnie Hill, testified that he was a "thoughtful and helpful" person. She also expressed disbelief that he had committed the murder. On cross-examination the prosecution, over defendant's objection, asked: "Do you know why your son killed?" The court ruled that she could answer that question if she had any personal knowledge from her contacts with him. She responded that she did not believe that he had committed the crime. Defendant now contends that the question was improper and the trial court erred in allowing it, because her opinion as to whether or why defendant committed the crime was not relevant to any of the aggravating and mitigating factors that could be considered in a penalty determination under section 190.3.

We disagree. The prosecution's cross-examination bore directly on the issue of defendant's character, because it tended to show that Hill's estimation of his character relied on a belief in his innocence or diminished culpability for the murder. Defendant's claim of error, whether framed in state law or federal constitutional terms, is therefore without merit.

### H. *Refusal to Admit Niles's Extrajudicial Statements at the Penalty Phase*

 As discussed above in part III.K., *ante*, defendant moved unsuccessfully at the guilt phase to introduce evidence of codefendant Niles's prior inconsistent statements to the police following his arrest. He unsuccessfully renewed his request at the penalty phase. He now claims that the trial court erred in refusing to admit such statements. His argument is based on the principle that a capital defendant has a right to present to the jury all evidence relevant to mitigation at the penalty phase. (See *Skipper* v. *South Carolina, supra*, 476 U.S. at p. 4 [90 L.Ed.2d at p. 6].) He claims that the

extrajudicial statements would have raised once again the issue of his and Niles's relative culpability for the murder, and could have possibly caused jurors to doubt that he had been the murderer. We disagree. For reasons explained above, Niles's out-of-court statements did not tend to shift culpability away from defendant and toward Niles. Rather, the statements were perfectly consistent with the prosecution's theory that both Niles and defendant were involved in the murder—Niles as the instigator and planner and defendant as the direct perpetrator. The trial court therefore did not abuse its discretion in refusing admission of these statements as not relevant to the mitigation of defendant's punishment.

## I. *Prosecutorial Misconduct*

Defendant claims several instances of prosecutorial misconduct which require reversal of his death sentence. We find no such misconduct.

 Defendant contends that the prosecution committed the misconduct identified in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633] (hereafter *Caldwell*). *Caldwell* held that it was "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." (*Id.* at pp. 328-329 [86 L.Ed.2d at p. 239].) *Caldwell* error may be committed when the prosecutor assures "the jurors again and again that they did not have to 'shoulder the burden of personal responsibility,' [tells] them again and again that the law 'protects' them from deciding what is 'just and right,' and even encourage[s] them to 'hide' behind the law." (*People* v. *Milner* (1988) 45 Cal.3d 227, 257 [246 Cal.Rptr. 713, 753 P.2d 669].) The fact that defendant did not make a contemporaneous objection to the prosecution's remarks does not bar him from raising a claim of *Caldwell* error on appeal. (*People* v. *Bittaker, supra,* 48 Cal.3d at p. 1104.)

In determining whether *Caldwell* error has occurred, "[w]e do not reach our conclusion based on any single statement uttered by the prosecutor. Rather, we consider the instructions of the court and the arguments of both prosecutor and defense counsel." (*People* v. *Milner, supra,* 45 Cal.3d at p. 257.) We also must consider the prosecution's statements within the overall context of its closing argument. (See *People* v. *Kaurish, supra,* 52 Cal.3d at p. 715.)

 Defendant cites several statements made by the prosecutor during closing argument in support of his claim of misconduct. The prosecutor stated toward the end of the argument: "December 13, 1984, ladies and

gentlemen, something happened. You know what happened? Noel Jackson by his own hand condemned himself to death . . . ." Also "In making your consideration and decision, you must do so after consideration of the facts and an application of the law without regard for the consequences." No error was committed. The prosecutor repeatedly emphasized throughout the closing argument that the jury's decision was left to the discretion of the individual jurors and their sense of the appropriate penalty, within the bounds prescribed by law. At one point the prosecutor told the jury that this was "one of the most difficult choices of your life." He also stated, "The only time 'must' appears in the law in this case, ladies and gentlemen, is that you must consider everything and then give everything the weight which you believe, in your sound individual and collective consideration, . . . it's worth." Because as a whole, there was no reasonable likelihood that the prosecution's argument misled the jury to believe that the responsibility for determining the appropriateness of defendant's sentence lay elsewhere, we find that no *Caldwell* error was committed.

Defendant also claims that the prosecutor made a number of other misstatements that amounted to misconduct. He failed to object to any of these statements or request any admonitions by the trial court. Nor does it appear that any harm from these statements was incurable through objection and admonition. Therefore these claims are waived on appeal. (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 685.)

These claims of prosecutorial misconduct also fail on the merits. Defendant contends the prosecutor committed misconduct by informing the jury that it no longer bore the burden of proving defendant's guilt beyond a reasonable doubt and that it had no burden of proof in the penalty phase. Not so. As we explained in *People* v. *Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376], "[b]ecause the determination of penalty is essentially moral and normative [citations], and therefore different in kind from the determination of guilt, there is no burden of proof or burden of persuasion." It is of course true that the prosecutor still bears the burden of proof with regard to other violent criminal activity. (See *People* v. *Morales* (1988) 48 Cal.3d 527, 566 [257 Cal.Rptr. 64, 770 P.2d 244].) The prosecutor acknowledged that burden, and the court properly instructed thereon. Thus, taken in context, there is no reasonable likelihood that the prosecutor's statements misled the jury.

Defendant contends that the prosecutor misled the jury with statements to the effect that defendant's conviction for murder with special circumstances was *by itself* sufficient to merit the death penalty. The prosecutor made no such misstatements. He merely focused at points on the egregious nature of

the murder—a legitimate consideration for the jury under section 190.3, factor (a). Elsewhere in his argument, the prosecutor discussed defendant's prior criminal activity and prior felony convictions. Furthermore, as discussed above, he continually emphasized the jury's discretion in making the penalty determination. There was no reasonable likelihood that a juror would conclude from the prosecutor's closing argument that the death penalty was automatic after special circumstances had been found.

Nor is there anything to defendant's assertion that the prosecutor misstated the law by claiming that he had only to prove beyond a reasonable doubt the jail escapes but not the rape. The prosecutor did state: "Before you consider anything in aggravation, you must show [sic] that the People have proved that crime beyond a reasonable doubt. That applies only to the crime involving the escape. There is no burden with respect to penalty." That statement was no doubt intended by the prosecutor to convey that the jury only had to find guilt beyond a reasonable doubt with regard to prior criminal activity rather than with respect to the ultimate penalty determination. The prosecutor's inadvertent omission of the crime of rape from the list of crimes of which the jury was required to find defendant guilty beyond a reasonable doubt was cured shortly thereafter when he informed the jury unequivocally that it would have to find guilt beyond a reasonable doubt in connection with the rape. There was no reasonable likelihood that the jury could have been mislead by the prosecutor's statements.

Defendant contends that the prosecutor misstated the evidence in several places, making him appear more culpable than he was. In particular, he claims that it was misconduct for the prosecutor to argue that defendant's sister and uncle were convinced that he was not guilty and that they based their assessments of his character in part on that fact. The record shows that defendant's sister and uncle, unlike his mother, did not purport to disbelieve his guilt, although they expressed surprise and shock at his crimes. There was no reasonable possibility, however, that the jurors would have been swayed by what was, at most, a minor mischaracterization of testimony.[19]

 Defendant claims that the prosecutor improperly referred to the statements of individual jurors during voir dire regarding the death penalty, as well as to his own personal feelings about the death penalty. These

---

[19]Defendant also contends the prosecutor made other misstatements, including a statement that he armed himself for his escape from an Oregon jail. "You know what he did, he escaped and he raped and he got a gun and he escaped." It was impossible that the jury could have interpreted the prosecutor's statement in the manner in which the defendant urges, in light of the prosecutor's detailed discussion elsewhere of the events of the rape, the discovery of defendant's gun, and the subsequent Oregon escape. Defendant's other claims of misstatement of evidence are similarly de minimis and are without merit.

remarks, taken in context, were merely a brief summary or survey of various common attitudes towards the death penalty. The prosecutor concluded that summary by stating that "the law does not allow us individually to set our own standards. We do not here follow 'an eye for an eye' . . . . The judge is going to tell you what you can consider for appropriate determination of penalty in this case . . . ." The prosecutor never used his own views or those of the jurors expressed in voir dire to suggest that jurors should employ a standard of penalty determination other than that prescribed by law.

Defendant contends that the prosecutor's arguments that there was no evidence in mitigation of defendant's guilt was misconduct. The prosecutor committed no error. He did not attempt to argue that jurors were prohibited from considering sympathy for defendant in making their penalty determination. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878-879 [196 Cal.Rptr. 309, 671 P.2d 813].) Rather, he asserted, in effect, that the aggravating evidence in this case greatly outweighed the mitigating evidence. As he stated: "When you think of sympathy for Noel Jackson think about Sonja Niles as she lay there. When you think of compassion and pity for Noel Jackson, think of Shelley P. and her plea not to hurt her, not to rape her. And measure that, ladies and gentlemen, against what may be called mitigation, if there is any." Here, the prosecutor was arguing implicitly that the testimony by defense witnesses designed to elicit sympathy from the jury "lacked the mitigating force the defendant claimed for it, a type of argument we have approved." (*People* v. *Raley*, *supra*, 2 Cal.4th at p. 917.)

Defendant claims that the prosecutor committed misconduct by reneging on an agreement not to emphasize Sonja Niles's occupation as a correctional officer, which he had made at the time the trial court decided to admit into evidence photographs of the victim's corpse—photographs that showed her clothed in her correctional officer's uniform taken shortly after the murder. There was no such agreement. Rather, the record reveals that the prosecutor merely stated that it would not be arguing that defendant's crime involved the special circumstance set forth in section 190.2, subdivision (a)(7): "[t]he victim was a peace officer . . . engaged in the course of the performance of his or her duties . . . ." The prosecutor never agreed nor did the trial court endorse any agreement to refrain from referring to Sonja Niles's occupation as a correctional officer during the penalty phase. His references during closing argument were as a means of emphasizing the egregious circumstances of defendant's crime and of underscoring his future dangerousness. No misconduct occurred.

Defendant contends that the prosecutor committed misconduct by presenting arguments in aggravation that do not relate to any of the statutory

aggravating factors, specifically arguments about his future dangerousness. ▪ We have held that prosecutorial argument concerning defendant's future dangerousness in the penalty phase of a capital trial is not misconduct. (*People* v. *Danielson* (1992) 3 Cal.4th 691, 720-721 [13 Cal.Rptr.2d 1, 838 P.2d 729].)

▪ Defendant claims that the prosecutor improperly injected religion into the proceedings. Although religious imagery or references may be misused by the prosecutor during the penalty phase of a capital case to suggest that there are standards of justice other than that prescribed by law which the jury should follow (see *People* v. *Poggi* (1988) 45 Cal.3d 306, 340 [246 Cal.Rptr. 886, 753 P.2d 1082]), it was not thus misused in this case. The prosecutor made reference to the story of Cain and Abel. The prosecutor did not urge the jury to apply a standard of punishment derived from the Bible, but merely made the point that defendant, who had been "sent away" and had "the mark of Cain," had escaped from prison and could not be relied on to remain there. The prosecutor's quotation of the familiar passage to "render unto Caesar what is Caesar's and unto God what is God's" was not an argument for using Biblical or religious criteria of justice, but rather quite the opposite—an appeal to use secular standards mandated by law to judge defendant.

In sum, we find the prosecutor did not commit misconduct and in any case caused no prejudice.[20]

### J. *Instructional Error*

Defendant claims the trial court erred in delivering several instructions and in refusing to deliver other instructions requested by defendant. No error was committed.

#### 1. *CALJIC No. 8.88*

▪ Defendant asserts that there are numerous flaws in CALJIC No. 8.88 (5th ed. 1988 bound vol.). The instruction, as delivered to the jury, is

---

[20]Defendant also claims that the asserted prosecutorial misconduct violated his constitutional rights of due process, an impartial jury and reliable capital sentence under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their California equivalents. Defendant failed to raise these objections below and they are waived on appeal. (See *People* v. *Benson, supra*, 52 Cal.3d at pp. 786-787, fn. 7.) Moreover, because these *federal* and *state* constitutional claims are based on state law error, i.e., prosecutorial misconduct, we find them to be without substance for the reasons stated above.

set forth in the margin.[21] He claims that the term "so substantial" in the last paragraph of the instruction is unconstitutionally vague under the Eighth Amendment. We have rejected such arguments. As we explained in *People v. McPeters* (1992) 2 Cal.4th 1148, 1194 [9 Cal.Rptr.2d 834, 832 P.2d 146], these words "plainly convey the importance of the jury's decision and emphasize that a high degree of certainty is required for a death verdict. Far from undermining defendant's cause at the penalty phase, they assisted defense counsel in emphasizing the gravity of the jury's task, which included the choice of death as a penalty." Defendant also contends that the word "warrants" is too broad and permissive and misleads the jury into believing that it may impose death even when not the "appropriate" penalty. We have rejected that argument. (See *People v. Breaux, supra*, 1 Cal.4th at p. 316.)

Defendant contends that CALJIC No. 8.88 is flawed because it does not inform the jury that it is required to return a verdict of life imprisonment without possibility of parole if it finds the aggravating factors do not outweigh the mitigating factors. It is not. As we stated in *People v. Duncan* (1990) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131]: "The instruction clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse (i.e., that if mitigating circumstances outweighed aggravating, then life without parole was the appropriate penalty)."

Defendant also contends that CALJIC No. 8.88 was flawed because it implied that a death sentence was compelled if the aggravating factors were found to outweigh the mitigating ones. But the instruction makes clear that the jury was "free to assign whatever moral or sympathetic value" it deemed appropriate to each of the various factors enumerated in the sentencing instruction. The instruction as a whole conveyed that the weighing process is

---

[21]CALJIC No. 8.88, as delivered in this case, states: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on the defendant. [¶] After having heard all the evidence and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. [¶] In weighing the various circumstances, you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole."

"merely a metaphor for the juror's personal determination that death is the appropriate penalty under all of the circumstances." (*People* v. *Johnson*, *supra*, 3 Cal.4th at p. 1250.) "There is no reasonable likelihood that the jury would have thought it could return a verdict of death if it did not believe that penalty was appropriate." (*Ibid.*)

Defendant also claims that CALJIC No. 8.88 was inadequate because it failed to specify that the prosecution had the burden of persuading the jury and that it must be convinced of the penalty determination beyond a reasonable doubt. But " '[w]e have consistently rejected the contention that the beyond-a-reasonable-doubt standard applies to the process of penalty determination . . . .' " (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1101 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Similarly, we have rejected the claim that either party has the burden of persuasion at the penalty phase. (*People* v. *Hayes*, *supra*, 52 Cal.3d at p. 643.)

Defendant also attacks CALJIC No. 8.88 because it failed to inform the jury that it could consider codefendant Niles's sentence of life imprisonment without possibility of parole in making its penalty determination. We have repeatedly rejected such arguments. (See *People* v. *DeSantis* (1992) 2 Cal.4th 1198, 1251 [9 Cal.Rptr.2d 628, 831 P.2d 1210], and cases cited therein.)

### 2. *Other Instructional Error*

■ The trial court gave the following sympathy instruction: "In this part of the trial you may consider pity, sympathy, or mercy for the defendant in deciding on the appropriate penalty for him. If a mitigating circumstance or an aspect of the defendant's background or his character called to your attention by the evidence arouses sympathy or compassion such as to persuade you that death is not the appropriate penalty, you may act in response thereto and impose a punishment of life without parole on that basis." This instruction was substantially as defendant had requested it, except that the requested instruction called for the phrase "or your observation of Noel Jackson" after the word "evidence," and requested the jury be instructed that it "shall" rather than "may" act in response thereto. Defendant contends that the trial court erred in not being given the instruction as requested. We disagree. The sympathy instruction quoted above was more than adequate to inform the jury that it could consider compassion for defendant in arriving at the penalty determination. Moreover, the trial court had instructed the jury in the catchall factor (k) of section 190.3 under CALJIC No. 8.84.1—"any other circumstance which extenuates the gravity of the crime"—and gave the following additional instruction: "You are not

permitted to consider any factors aggravating unless it is specified in a list of factors you have been given previously; there is however no limitation of what you may consider as mitigating." The jury was thus reasonably informed that it could act out of sympathy to spare defendant's life, and the trial court committed no error in refusing the additional phrases proffered by defendant. (See *People* v. *Berryman*, *supra*, 6 Cal.4th at p. 1097 [upholding trial court's refusal to give an instruction almost identical to the one requested by defendant].)

Prior to its guilt phase deliberations, the jury was instructed to "reach a just verdict regardless of what the consequences of such a verdict may be." Defendant contends that the jury should have been given a direct admonition at the penalty phase to disregard the earlier instruction. He claims that failure to administer such an admonition sua sponte denied him due process, fair trial, and reliable sentencing rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and their California equivalents. Yet, as explained above, the prosecutor's closing arguments properly emphasized the individual responsibility that jurors assumed in making a capital sentencing determination, and the jury was instructed that it could consider sympathy for the defendant in making such a determination. There is no reasonable possibility that the absence of an admonition to the jury to ignore earlier "regardless-of-the-consequences instructions" would have caused the jury to misunderstand the true nature of its sentencing responsibilities. (See *People* v. *Cummings*, *supra*, 4 Cal.4th at p. 1337.)

K. *Cumulative Error*

Defendant claims that the errors during the guilt phase, even though insufficient to require a guilt phase reversal, require reversal of the death judgment. As explained above, what few errors occurred at the guilt phase were harmless. A cumulative assessment of the nature of those errors does not lead us to believe that they had an impact either on the guilt phase or the penalty phase.

Defendant also contends that the cumulative effect of the errors committed at the penalty phase as well as the guilt phase requires reversal of the penalty conviction. We find no prejudice, whether the minor errors that occurred at the penalty phase are considered singly or together.

L. *Unconstitutionality of State Death Penalty Law*

Defendant contends that section 190.3, factors (a), (b), and (i) are unconstitutionally vague under the Eighth Amendment of the United States Constitution. They are not. (*Tuilaepa* v. *California* (1994) 512 U.S. 967, __ [129

L.Ed.2d 750, 763, 114 S.Ct. 2630, 2637-2638]; *People* v. *Hawkins*, *supra*, 10 Cal.4th at p. 964.)

Defendant also claims that the 1978 death penalty statute is unconstitutional because it fails to require that the jury unanimously agree on which factors it considered in aggravation, and also fails to require it to produce a written statement of reasons for its determination. Defendant claims that the statute is thereby inadequate to ensure a reliable sentencing determination and adequate appellate review under the Eighth Amendment. We have repeatedly rejected that argument (see *People* v. *Wader* (1993) 5 Cal.4th 610, 669-670 [20 Cal.Rptr.2d 788, 854 P.2d 80]), and decline to reconsider it here.

### M. *Refusal to Conduct Proportionality Review*

 Following the death verdict, defendant filed a "Motion to Bar/Strike the Death Penalty as Disproportionate." The motion was based on the difference between defendant's sentence and that of his codefendant, Niles, who received a sentence of life imprisonment without possibility of parole. The trial court denied the motion. Defendant now contends that the trial court erred, in violation of his rights of due process, equal protection, and a reliable determination of penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their equivalents under the California Constitution. No error was committed. Defendant relies on *People* v. *Dillon* (1983) 34 Cal.3d 441, 478 [194 Cal.Rptr. 390, 668 P.2d 697], in which we held "a statutory punishment may violate the constitutional prohibition [against cruel and unusual punishment] not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed." Such reliance is misplaced. As we stated elsewhere: "Properly understood, intracase proportionality review is 'an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others.'" (*People* v. *Hill* (1992) 3 Cal.4th 959, 1014 [13 Cal.Rptr.2d 475, 839 P.2d 984].) Here, there is no question that defendant's act—a murder for hire—is not constitutionally disproportionate to the death sentence he received.

### N. *Section 190.4, Subdivision (e) Motion*

 Defendant's motion to modify the verdict of death to life imprisonment without possibility of parole, pursuant to section 190.4 subdivision (e), was denied by the trial court. He now contends that it erred in making this determination because its decision on the motion relied on impermissible considerations requiring reversal. We disagree.

Defendant points out that the court, in reviewing the evidence against him, found he was "lying in wait" when he went to the Niles residence, a fact never established at trial. But there is no reasonable possibility that this mischaracterization by the trial court affected its sentencing determination.

Defendant also points to the trial court's reliance on improper sentencing considerations when it stated: "Despite the arguments as to whether or not the death penalty is a deterrent, if you would just forget that argument, the death penalty is an absolute guaranty against recidivism, and that is something we should be concerned about considering how often it happens." The trial court also stated: "And I consider that when a person does certain kinds of things, including murder for financial gain and not even in hand, the hope to get paid out of the insurance proceeds to be received later, such is not the kind of case that you may want the defendant back on the street. The same as is fortunate that Manson got the benefit of the declaration of unconstitutionality of the prior death penalty which had been imposed on him." Defendant contends that these kinds of considerations were extraneous to the court's section 190.4, subdivision (e) review of the verdict.

These statements by the trial court, which can be characterized as interjections of its general opinion on the appropriateness of the death penalty, form no basis for reversing defendant's sentence. Section 190.4, subdivision (e) provides that in ruling on the application to modify the verdict of death the judge shall "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." Before making the comments quoted above, the trial court did review the circumstances of the murder, the Riverside escape, and the rape of Shelley P., and then concluded: "Based on everything I have indicated and all the evidence which was heard by the jury, which I am basing the comparison on, it appears to me that the aggravating circumstances do, indeed, outweigh from all considerations, the mitigating, and that this is a case in which the death penalty is truly deserved."

Shortly thereafter, the prosecution sought clarification from the court, stating: "Is the court specifically finding that the jury's verdict was proper in your view and that your independent analysis, even over and above what the jury found, that the court heard any evidence considering [*sic*] the witnesses, their manner and demeanor, everything that happened in the particular case at the guilt and penalty phase, and in your independent judgment death is the

appropriate verdict?" The court responded: "That's right, I am referring solely to the evidence that was presented to the jury and that I heard concurrent with the jury's hearing and seeing the evidence of what was presented." As discussed above, the record revealed that the judge did in fact conduct an independent review of the evidence and consider the proper aggravating and mitigating circumstances. Moreover, although the court did not mention any specific mitigating circumstance in its sentencing review, we may reasonably infer that the court found the mitigating circumstances— i.e., the defendant's family background and the sympathy which defendant's family attempted to elicit for him—to be insufficiently substantial to warrant comment.

Defendant also contends that trial court erred by reading and considering the probation report prior to ruling on the modification motion. But although the trial court stated that it had (mistakenly) read the probation report, nothing in the record indicates that it considered the report in making its sentencing determination. "[I]t is presumed that the court was not influenced by irrelevant matters in the probation report, absent evidence to the contrary." (*People* v. *Hawkins, supra,* 10 Cal.4th at p. 971.) There was no evidence of improper influence.

## VI. DISPOSITION

For all the foregoing, the judgment is affirmed in its entirety.

George, C. J., Kennard, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**MOSK, J.**—I concur, of course, in the opinion I have prepared for the court. I write separately for two reasons: (1) because my method of analyzing the validity of defendant's motion under *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*) and *Kentucky* v. *Batson* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (*Batson*), differs from that currently accepted by this court, and (2) in order to express my disagreement with the views set forth in Justice Baxter's concurrence with regard to the admissibility of the Oregon escape.

## I.

As I explained in my dissent in *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1292 [255 Cal.Rptr. 569, 767 P.2d 1047] (*Johnson*), it is useful and appropriate for appellate courts to compare "the prosecutor's treatment of minority and nonminority prospective jurors" in reviewing the validity of *Wheeler/*

*Batson* challenges. Evidence of disparate treatment between these two groups—that the former are challenged for characteristics or responses that go unchallenged in the latter—is "strongly suggestive of bias." (*People* v. *Hall* (1984) 35 Cal.3d 161, 168 [197 Cal.Rptr. 71, 672 P.2d 854].) Such comparative analysis raises questions about the exclusion of prospective juror Mary Alford in the present case.

As I stated in *Johnson*, in reference to an appellate court's evaluation of the race neutrality of the reasons offered by the prosecutor for peremptorily challenging a minority prospective juror: "[I]n appropriate cases a comparison of the prosecutor's treatment of minority and nonminority prospective jurors can be a highly useful analytical tool: when the record shows disparate treatment and it remains unexplained, how else is a court to determine the genuineness of the prosecutor's claimed reason? In these circumstances the inference that the claimed reason is not the actual ground of the challenge may not only be reasonable, it may be compelling. To prohibit courts from drawing that inference in proper cases will deny them a valuable tool that aids them in discharging their duties under *Wheeler* and *Batson*." (*Johnson, supra*, 47 Cal.3d at p. 1292 (dis. opn. of Mosk, J.).) The majority in *Johnson* rejected the validity of such comparative analysis. (*Johnson, supra*, 47 Cal.3d at p. 1221.) In doing so, this court placed itself distinctly in the minority among those that have considered this question. I cited in *Johnson* a number of state and federal cases that have used disparate treatment analysis in reviewing *Batson*-type claims. (47 Cal.3d at pp. 1293-1294.) Since *Johnson* was decided, a number of cases have reaffirmed the validity of such analysis, either by expressly endorsing it, or by employing it to determine the merits of a *Batson* challenge. (See, e.g., *U.S.* v. *Chinchilla* (9th Cir. 1989) 874 F.2d 695; *Devose* v. *Norris* (8th Cir. 1995) 53 F.3d 201, 204; *Hollingsworth* v. *Burton* (11th Cir. 1994) 30 F.3d 109, 112-113; *Jones* v. *Ryan* (3d Cir. 1993) 987 F.2d 960, 973-974; *U.S.* v. *Hatchett* (6th Cir. 1990) 918 F.2d 631, 636-637; *Emerson* v. *State* (Tex.Crim.App. 1993) 851 S.W.2d 269, 273-274; *Roundtree* v. *State* (Fla. 1989) 546 So.2d 1042, 1044-1045; *State* v. *Collier* (La. 1989) 553 So.2d 815, 822; *State* v. *Oglesby* (1989) 298 S.C. 279 [379 S.E.2d 891].) .

That is not to say that a disparate treatment analysis of peremptory challenges is a simple matter. As we acknowledged in *Wheeler*, subjective factors, not apparent on the record or easily articulable, may legitimately play a critical role in an attorney's exercise of a peremptory challenge. (*Wheeler, supra*, 22 Cal.3d at p. 275.) For that reason, we generally defer to the findings of the trial court. But the mere fact that subjective factors are sometimes key to a peremptory challenge does not categorically immunize a trial court's decision on a *Wheeler* motion from appellate review. Once a

defendant has made a prima facie case, a prosecutor's assertedly race-neutral justifications are subject to a higher scrutiny. (*Johnson, supra,* 47 Cal.3d at p. 1284 (dis. opn. of Mosk, J.).)

Moreover, when an appellate court discovers, in scrutinizing the record through comparative analysis and otherwise, that the prosecutor's stated *objective* reasons for its peremptory challenges are dubious, then the court may give less credence to his *subjective* reasons. (See *U.S.* v. *Chinchilla, supra,* 874 F.2d at pp. 698-699.) In *Chinchilla,* the court concluded that two of the objective reasons stated by the prosecutor for excluding the only two Hispanic prospective jurors—place of residence and age—were either unsupported by the record or did not withstand comparative analysis. The court then concluded that the two reasons given by the prosecutor that were incapable of verification—that one of the prospective jurors had a poor appearance and that the other's employment as a restaurant manager would make him less fit as a juror on that case—had little credibility. (*Id.* at p. 699.) As Judge Kozinski recently put the matter: "While subjective factors may play a legitimate role in the exercise of [peremptory] challenges, reliance on such factors alone cannot overcome strong objective indicia of discrimination such as a clear and sustained pattern of strikes against minority jurors. The stronger the objective evidence of discrimination, the more we will require by way of verifiable facts to sustain a trial court's finding upholding the exercise of challenges." (*Burks* v. *Borg* (9th Cir. 1994) 27 F.3d 1424, 1429-1430.)

Accordingly, the more that comparative analysis of the objective reasons for the exercise of peremptory challenges against minority jurors points toward disparate treatment based on race or on some other improper category, the less courts should credit counsel's purely subjective reasons. This principle is particularly true in cases such as the present, in which the trial court's ruling on the *Wheeler* motion was brief and conclusory, containing no findings of fact. Such rulings raise the question whether the trial court had truly engaged in a "sincere and reasoned attempt to evaluate the prosecutor's explanation . . . ." (*People* v. *Hall, supra,* 35 Cal.3d at p. 167.) The tendency of trial courts to deal perfunctorily with *Wheeler* motions may be understandable, given the press of the court's business, but it also further underscores the importance of appellate review. "Even the most conscientious trial judge can be misled by such extraneous pressures as a reluctance to dismiss the venire after some or all of the jurors have been seated, or a felt urgency to begin taking testimony in a trial expected to be lengthy, or a natural disinclination to disbelieve assertions of good faith made by an attorney in open court. An appellate court, of course, is removed from such

pressures." (*People* v. *Johnson*, *supra*, 47 Cal.3d at p. 1291 (dis. opn. of Mosk, J.).)[1]

In the present case, the prosecutor used three of eighteen peremptory challenges against Black prospective jurors, thereby excluding all Blacks from the jury. Defendant himself was Black. Thus a Black defendant was tried by an all-White jury. As Justice Frankfurther wrote in *Offutt* v. *United States* (1954) 348 U.S. 11, 14 [99 L.Ed. 11, 16, 75 S.Ct. 11], "[J]ustice must satisfy the appearance of justice."

As the majority correctly conclude, the trial court's inquiry into the prosecutor's justifications for the peremptory challenges constituted " 'at least an implied finding' of a prima facie showing" of systematic exclusion. (*People* v. *Fuentes* (1991) 54 Cal.3d 707, 716 [286 Cal.Rptr. 792, 818 P.2d 75].) I agree with the majority that the reasons for challenging exclusion of two of the three Black prospective jurors—Annie Hysmith and Verdan Verret—were race neutral: Hysmith had expressed general opposition to the death penalty, and Verret had stated that he had had a number of bad experiences with the police and mistrusted their testimony.

The exclusion of prospective juror Alford is more troubling. Alford was 44, a stable member of the community, born and raised in Riverside, and employed as a traffic management officer at March Air Force Base. She had been married for over 24 years and had 2 children. The prosecutor, relying a good deal on the lengthy jury questionnaires, as well as on voir dire, gave a number of reasons for excluding Alford. Two of those reasons seem highly dubious. The prosecutor stated that "I have the reference to Question 82 on the questionnaire; she would feel very, very sorry for drug users. This case will involve, I believe, Mr. Jackson with respect to the use of drugs." Question 82 asked prospective jurors: "In general, how do you feel about users of drugs?" Alford replied: "They need help to get off drugs." Her

---

[1]My conclusion that comparative analysis is a useful and sometimes necessary tool in the review of *Wheeler/Batson* challenges is not altered, and is indeed reinforced, by the recent United States Supreme Court case of *Purkett* v. *Elem* (1995) __ U.S. __ [131 L.Ed.2d 834, 115 S.Ct. 1769]. There the court held that in a *Batson* challenge when a defendant has made out a prima facie case of racial discrimination, the race-neutral reasons that the prosecutor gives to rebut that case do not have to be intrinsically plausible. (*Id.* at p. __ [131 L.Ed.2d at p. 839, 115 S.Ct. at p. 1771].) It is only at the third step of the *Batson* challenge process—the determination by the trial court of whether the opponent of the peremptory challenge has proved purposeful racial discrimination—that the plausibility of the prosecutor's reasons are to be considered. "At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." (*Ibid.*) It is thus consistent with *Purkett* v. *Elem* to have both trial and appellate courts use comparative analysis as an aid to determine the plausibility of the prosecutor's explanation at this third step in the *Batson* process.

response does not express an inordinate sympathy for criminals who are drug users, and was in fact strikingly similar to the response of many of those who served as jurors. Juror Raymond Watkins's response to the same question was "they need help." Juror Annette Risinger stated that drug users "have problems and can't cope." Juror Terry Harvey stated that drug users "are wrong and need help." Juror William Clark stated that drug users "need counseling and to establish positive goals in life without drugs." Juror Michael Gray stated that drug users "need help." Juror Martha Perkins stated that most drug users would need "extensive help" in order to break their drug habit. Thus, Alford's seemingly innocuous statement that drug users "need help" placed her squarely within the mainstream of opinion of those who were ultimately chosen for defendant's jury.

Another reason given for her exclusion was that "she may give too great a weight to psychiatric testimony." On the questionnaire, Alford expressed the view, in response to a question concerning her opinion of psychiatry and counseling, that these therapies "could help a person." She stated that a psychological evaluation "sometimes" may be considered in understanding human behavior. She further indicated that she had had no personal experience with mental health counseling. Finally, in response to the question: "If you sit as a juror on this case, would you be willing to consider psychiatric and/or psychological testimony," she stated: "depends on the person who is on trial, and the evidence." In these noncommittal responses, she gave answers that were similar to virtually every one chosen as a juror in this case, except that a number of jurors expressed a much *more favorable* view of the efficacy of psychotherapy and of psychological theories. It is difficult to imagine how these responses could have justified the peremptory challenge.

A third reason given by the prosecutor also seems quite dubious: she had "scored not high on [the death] penalty." In fact, in the questionnaire the prospective jurors were asked whether they "generally support" or "generally oppose" the death penalty, and Alford chose the former. She stated, in response to the question whether death or life without parole are worse punishment, that "they are both hard punishment." She indicated no opinion with respect to a question about whether the death penalty deters crime. She also expressed unequivocal support for the death penalty during voir dire. Others with openly ambivalent attitudes toward the death penalty were permitted on the jury. Juror Agnes Plantenga expressed no support for the death penalty in her questionnaire, stated that it did not deter crime, and in voir dire explained that she would have "a very hard time" with imposing the death penalty. Juror Michael Fogerty crossed out "generally support" on his questionnaire and wrote that he "sometimes supports" the death penalty, and

indicated that he did not believe it to be a deterrent. Juror Perkins did not indicate support for the death penalty and expressed in voir dire considerable reluctance to administer the penalty. A number of other jurors indicated that they did not believe the death penalty deterred crime.

The prosecutor gave as a further reason for Alford's exclusion: "This is also the woman who I had basically [a] bad feeling about, because she said she could remember everything. . . ." He referred to Alford's response to a rhetorical question he posed during voir dire: "Can anyone tell me what you were doing four years ago today?" The question was asked in the context of explaining to prospective jurors that the crime for which defendant was charged occurred four years ago, and that the fact that memories may have faded should not be counted against a witness's credibility. Juror Alford stated in response to the question that she would in fact be able to tell what she was doing four years previous—that is, that she was working at her present job. The prosecutor recalled that he was impressed with "how proud of the fact [that] she could remember exactly what she was doing" four years ago and that he felt "she would be hypercritical of witnesses in this case because of the extended time period delay." But the record shows that Alford never claimed that she could *remember* what she was doing four years ago, but only that she would be able to *tell* what she was doing, and not because of an extraordinary memory but because her life followed a routine. Her response was clarified when she admitted that she would not be able to tell "minute to minute" what she was doing four years ago. Nothing she said suggested that her knowledge of what she had been doing four years ago sprang from direct recollection, or that she would be hypercritical of witnesses who could not recall nonroutine events such as the circumstances of the murder.

The prosecutor gave as an additional reason for Alford's exclusion that she had indicated that her daughter, as a minor, had recently pleaded guilty to a misdemeanor in connection with the theft of $100 from the bank in which she was employed. Alford characterized her daughter's case as that of a "minor misdemeanor" that would not affect her views of the case. A number of jurors had close relatives charged and convicted of crimes, some of them fairly serious, or had themselves been convicted of a crime. One had a brother arrested in a gang-related incident; another's stepfather had been convicted of murder; another had been arrested for driving while under the influence; another's son had been involved in car theft as a juvenile.

Finally, the prosecutor stated that Alford appeared to be "quite nervous." Nothing in the record before us confirms or undermines this impression.

In addition to analysis of disparate treatment between stricken minority prospective jurors and nonminority jurors, it can also be useful to compare

the stricken minority prospective jurors with the nonminority prospective jurors who were also stricken. If the nonminority prospective jurors who were challenged peremptorily had characteristics similar to the minority prospective jurors also challenged, then this would support the prosecutor's case that his challenges were in fact race neutral. The inverse is also true—a marked disparity between challenged minority and nonminority prospective jurors may further corroborate unlawful prosecutorial bias. In the present case, the record reveals that the great majority of non-Black prospective jurors differed from Alford in an important respect. Of the 15 non-Black jurors challenged peremptorily, 12 either indicated that they "generally opposed" the death penalty or did not support it, or else indicated that life imprisonment without possibility of parole would be a greater punishment than death. Of the three remaining prospective jurors, one was a low-income Hispanic woman, one was a former alcoholic who expressed some ambivalence about the death penalty, and one shared with defense counsel an enthusiasm for gambling. Thus, prospective juror Alford stood out in contrast to the nonminority challenged prospective jurors in her unqualified support for the death penalty and her conventional lifestyle and habits— further confirmation that her exclusion may not have been race neutral.

Nonetheless, although the question is troublesome, I cannot conclude with assurance that Alford's exclusion was motivated by race. The fact that Alford's daughter had recently been convicted of a misdemeanor by the very office that was now prosecuting this case may be considered a valid, race-neutral reason for excluding her, in spite of the fact that some with prior personal involvement in the criminal justice system were allowed to sit on the jury. Because the recent conviction of Alford's daughter by the Riverside District Attorney was itself a sound, objectively plausible basis for challenging a juror peremptorily, the fact that not all jurors whose family members had prior convictions were stricken from the jury is of less significance. And, although the exclusion of even a single juror based on race is unconstitutional and requires reversal (*People* v. *Monteil* (1993) 5 Cal.4th 877, 909 [21 Cal.Rptr.2d 705, 855 P.2d 1277]), it is more difficult on the basis of a lone questionable peremptory challenge to discern a practice of racial exclusion, given the legitimate role that subjective factors may have in a prosecutor's decision. I am therefore unable to conclude with certainty from the present record that prospective juror Alford was excluded because of her race. I therefore concur in the majority's holding that rejection of defendant's *Wheeler/Batson* challenges does not require reversal.

## II.

The majority do not address the question whether the admission of the Oregon escape evidence was error, concluding in any case that it was not

prejudicial. Justice Baxter, in his concurrence, would have this court reach that issue, and hold that the evidence is admissible. I would reach the contrary view.

As recounted in the majority opinion, defendant escaped from an Oregon jail cell with another inmate, using furniture in the room to break the thick plexiglass window of his cell. Defendant was apparently unarmed at the time. The escape involved no confrontation with any jail guard. Defendant was captured later that day, unarmed, and did not resist arrest. No force or violence resulted.

Penal Code section 190.3, factor (b) (all further statutory references are to this code) directs the jury to take into account at the penalty phase "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Section 190.3 also states that no evidence of criminal activity shall be admitted at the penalty phase that does not meet the criteria set forth in factor (b) (excepting evidence of prior convictions). In *People* v. *Boyd* (1985) 38 Cal.3d 762, 776-777 [215 Cal.Rptr. 1, 700 P.2d 782], we held that evidence of an escape attempt that did not involve the use of force or violence against *persons* was not within the scope of criminal activity contemplated by factor (b), and was therefore inadmissible. In so holding, we rejected an argument that the term "force or violence" could be construed to mean the violent injury to property, such as the removal of the metal grating to an air vent in that case. As we stated: "The purpose of the statutory exclusion is to prevent the jury from hearing evidence of conduct which, although criminal, is not of a type which should influence a life or death decision. If theft of property is inadmissible—and it clearly is under the statutory language—then we cannot find that damage to property . . . is entitled to any greater consideration." (38 Cal.3d at p. 776; see also *People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 148 [2 Cal.Rptr.2d 335, 820 P.2d 559].)

Justice Baxter does not dispute *Boyd*'s conclusion that property damage alone is insufficient to constitute violent criminal activity admissible under section 190.3, factor (b). Rather he concludes, based on an expansive reading of the language of factor (b), that defendant's nonviolent escape nonetheless constituted an "implied threat" of force or violence. I disagree.

When construing an initiative statute such as section 190.3, we look first to the language of the statute. "Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 543 [277 Cal.Rptr.

1, 802 P.2d 317].) In the present case, it is undisputed that no actual violence against persons was committed in the course of the Oregon escape. We must determine rather whether there was a "threat to use force or violence." The dictionary reveals that the term "threat" has two primary meanings. One is "[an] expression of an intention to inflict loss or harm on another by illegal means and esp[ecially] by means involving coercion or duress of the person threatened." (Webster's New Internat. Dict. (3d ed. 1961) p. 2382.) There is no evidence of any threat, express or implied, in this sense of the word occurring in connection with the Oregon escape.

The second meaning of the word is "something that by its very nature or relation to another threatens the welfare of the latter," as in "the crumbling cliff was a constant [threat] to the village below." (Webster's New Internat. Dict., *supra*, at p. 2382.) A related meaning is "an indication of something impending and usu[ally] undesirable or unpleasant" as in "the air held a [threat] of rain." (*Ibid.*) Justice Baxter appears to mean that defendant's Oregon escape constituted an implied "threat" in this sense. In other words, defendant's Oregon prison escape was something that by its very nature threatened harm to others, or that violence was impending in the escape.

There are two problems with this position. First, it is unlikely that the word "threat" was being used in this sense. The conjunction of the word "threat" with the phrase "to *use* force or violence" appears to contemplate the more common usage of "threat" as the expression of a menacing intention.

Second, even if section 190.3 is using the term "threat" broadly in both senses of that term, there is still no evidence that defendant threatened the use of force or violence. On the contrary, the success of the escape appeared to be premised on defendant, who was unarmed, *avoiding* confrontation with armed jail guards. In this critical respect, the Oregon escape differs from the escape attempts or conspiracies considered in those cases cited by Justice Baxter in support of his position. (See *People* v. *Mason* (1991) 52 Cal.3d 909, 955 [277 Cal.Rptr. 166, 802 P.2d 950] [planned escape would have been impossible to carry out without confrontation with prison guards]; *People* v. *Gallego* (1990) 52 Cal.3d 115, 196 [276 Cal.Rptr. 679, 802 P.2d 169] [escape conspiracy in which a "shank" was to play a part]; *People* v. *Boyde* (1988) 46 Cal.3d 212, 249-250 [250 Cal.Rptr. 83, 758 P.2d 25] [possession and possible use of a gun part of the escape plan].) In the present case, we have no evidence that violence was being planned or even prepared for, merely speculation that the situation *could* have turned violent if circumstances had been different. Lacking "substantial evidence from which a jury could conclude beyond a reasonable doubt that violent criminal activity

occurred" (*People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 587 [15 Cal.Rptr.2d 382, 842 P.2d 1142], affd. *sub nom. Tuilaepa* v. *California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630]), we must conclude the trial court erred in admitting this evidence.

*People* v. *Stanley* (1995) 10 Cal.4th 764, 823-824 [42 Cal.Rptr.2d 543, 897 P.2d 481], cited by Justice Baxter, is also inapposite. In that case, defendant burned his wife's car as part of a reign of terror against her that led to her eventual murder. We found that the destruction of personal property, in that particular context, was "an integral part of [the defendant's] attempt to frighten and control" the victim, and as such an act or threat of violence. (*Id.* at p. 824.) But no such personal threat can be read into defendant's destruction of jail property in order to effectuate his escape.

Justice Baxter's assertion that the escape represented an " implied threat of violence" is based in large part on the fact that the escape "engender[ed] an immediate manhunt which ended in [defendant's] recapture by officers brandishing firearms." (Conc. opn. of Baxter, J., *post*, at p. 1258.) But as we have stated: "We reject the argument that all escapes, however nonviolent, are inherently dangerous because they invite efforts of prevention and apprehension by custodial and law enforcement officers. The possibility of violence during an escape can become an actuality only when, under the facts of the particular case, the escapee attempts violent resistance or, in his efforts to elude capture, conducts himself in a reckless manner." (*People* v. *Lopez* (1971) 6 Cal.3d 45, 52 [98 Cal.Rptr. 44, 489 P.2d 1372].) There is no evidence that defendant engaged in such resistance or recklessness in this case.[2]

Nor is the fact that defendant had used violence in the past to escape from the Riverside jail credible evidence that he "threatened" the use of violence during the Oregon escape. To the contrary, in this instance, he did not behave violently toward any persons, did not express any intention to use violence, and did not prepare for violence in the course of the latter escape. It appears elementary that we cannot impute to him violent criminal activity based alone on speculation about his mental state.

In sum, defendant's escape from his Oregon jail did not involve an "implied threat to use violence," in any conventional sense of the word

---

[2]Of course, as Justice Baxter points out, the mere fact that escape is not an "inherently dangerous" felony for purposes of the felony-murder rule, as we held in *Lopez*, does not mean that it may never be considered to be violent criminal activity admissible under section 190.3, factor (b). (See *People* v. *Mason*, *supra*, 52 Cal.3d at p. 955.) But what the *Lopez* holding does mean, in the context of section 190.3, factor (b), is that we must review the factual setting of each particular escape to determine whether it involved actual or threatened violence and not presume that the escape was violent because of the *possibility* of violence in reapprehension.

"threat." Thus, Justice Baxter's assertion that such escape evidence should be admitted because it is "particularly pertinent to an individualized determination of the appropriate penalty in a capital case" (conc. opn. of Baxter, J., *post*, at p. 1262), is irrelevant. Section 190.3 does not permit consideration of all criminal activity that may be relevant to individual culpability and penalty, but only certain specific types of criminal activity, i.e., activity that at least implies a threat to use force or violence. We have no warrant to ignore the statute's express prohibition and to venture beyond the boundaries it has imposed on consideration of a defendant's past actions at the penalty phase of a capital trial.

I would therefore conclude that the Oregon escape evidence should have been excluded.

**BAXTER, J.**—I concur in the judgment affirming the guilt and penalty verdicts. I also agree with the bulk of the majority's analysis. However, the majority decline to decide whether it was error to admit defendant's Oregon escape as aggravating evidence at the penalty phase, simply concluding instead that if there was error, it was harmless.

I agree that admission of the Oregon escape had no prejudicial effect on the penalty outcome. However, I would reach the question avoided by the majority. I conclude that because the Oregon escape "involved . . . the express or implied threat to use force or violence," its admission was proper under factor (b) of Penal Code section 190.3.[3]

By its nature, escape from secure confinement demonstrates a desperate readiness to resist lawful custody and raises a high likelihood of confrontation with guards, witnesses, pursuing police, or innocent citizens. It thus presents a substantial "threat" of violence, even when no violence was specifically planned and no person was actually hurt.

Moreover, the specific facts of defendant's Oregon escape amply demonstrate its inherent potential for violent or threatening encounters. At the time he broke out of the Oregon jail, defendant was already a capital fugitive, violent escapee, and multiple felon who faced serious consequences in two states unless he took extreme measures to regain his freedom. By great exertion and determination, he escaped under circumstances which almost guaranteed that he would be stopped or promptly pursued. In fact, his breakout did engender an immediate manhunt which ended in his recapture by officers brandishing firearms.

From these facts, a jury could readily infer that defendant was willing to make good his escape at any cost, would resist if the necessity and opportunity arose, and in any event had created a situation where the inherent

---

[3] All subsequent statutory references are to the Penal Code unless otherwise indicated.

potential for violent confrontation was high. The escape, a criminal offense, thus presented an "express or implied threat [of] force or violence." Nothing in the death penalty statute, our cases, or common sense precluded the sentencer from drawing that conclusion simply because, by luck, defendant did not actually menace or harm any person.

That section 190.3 intends the broadest possible aggravating use of criminal conduct involving *actual or potential* violence is clear from the statute's wording. Factor (b) of section 190.3 (factor (b)) provides that the aggravating evidence may include any "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Use of the words "involved" and "express or implied threat" indicates that all criminal conduct in which the specific likelihood of violence arose is relevant.

Thus, the statute does not simply encompass those offenses that are defined in violent terms, but includes all "crimes that were perpetrated in a violent or threatening manner." (*People* v. *Grant* (1988) 45 Cal.3d 829, 851 [248 Cal.Rptr. 444, 755 P.2d 894].) And nonviolent aspects of a course of criminal conduct may be shown in order to demonstrate the "context" in which violent or threatening conduct took place. (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1013-1014 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741]; see also *People* v. *Cooper* (1991) 53 Cal.3d 771, 840-841 [281 Cal.Rptr. 90, 809 P.2d 865].)

Defendant urges that his only "violence" in the Oregon escape was his destruction of his cell bench and the jailhouse window. He stresses the absence of evidence that he was armed, or that any innocent person was immediately present against whom "violent" conduct could have been directed. He notes we held in *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782] that an escape is not "violent" within the meaning of factor (b) simply because it involves damage or destruction to property in an area not then occupied by potential human victims. (38 Cal.3d at pp. 776-777.)

However, *Boyd* was argued and decided *exclusively* on the narrow question whether property damage *alone* is sufficient to constitute "force or violence" under factor (b). *Boyd* does not stand for any broader principle that criminal conduct, including an escape, must be considered nonviolent unless a human being was actually assaulted or menaced. As later cases make clear, the law is otherwise.

In *People* v. *Stanley* (1995) 10 Cal.4th 764 [42 Cal.Rptr.2d 543, 897 P.2d 481], for example, we held that destruction of property may be considered

"violent" criminal conduct where it implies a threat to another's personal safety. (*Id.* at pp. 823-824 [husband's "torching" of wife's car as intimidating prelude to her murder three weeks later].) And we have consistently ruled that "a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under factor (b). Such conduct is unlawful and involves an *implied threat* of violence *even where there is no evidence defendant used or displayed it in a provocative or threatening manner.* [Citations.]" (*People* v. *Tuilaepa* (1992) 4 Cal.4th 569, 589 [15 Cal.Rptr.2d 382, 842 P.2d 1142], italics added; see also, e.g., *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1186-1187 [270 Cal.Rptr. 286, 791 P.2d 965]; *People* v. *Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240].)

Moreover, since *Boyd* was decided, we have demonstrated our understanding that the peculiar dangers posed by an escape attempt may make it an "express or implied threat [of] force or violence" against persons, and thus admissible under factor (b), even when, by good fortune, no person actually came in harm's way. Thus, in *People* v. *Boyde* (1988) 46 Cal.3d 212 [250 Cal.Rptr. 83, 758 P.2d 25], the defendant solicited another inmate, Moore, to help him escape from the jail roof. Under the plan, Moore was to leave a gun on the roof for the defendant's use in subduing the guard if necessary. (*Id.* at p. 248.) We concluded that the jury could find a completed criminal conspiracy, and because the escape plan contemplated possible violence, it met the "force or violence" test of factor (b). (46 Cal.3d at pp. 249-250.)

Similarly, in *People* v. *Gallego* (1990) 52 Cal.3d 115 [276 Cal.Rptr. 679, 802 P.2d 169], jail guards thwarted an escape conspiracy evidenced by the defendant's note to another inmate in which a jail-made "shank" was mentioned. (*Id.* at p. 155.) We refused to accept the contention that there was insufficient evidence of any crime to allow consideration of the escape plan under factor (b). (52 Cal.3d at p. 196.) This determination assumed the rule of *Boyde,* i.e., that the defendant's mere mention of weapon use in connection with the plan was enough to allow its consideration as "violent" conduct.

In *People* v. *Mason* (1991) 52 Cal.3d 909 [277 Cal.Rptr. 166, 802 P.2d 950], we squarely held that an escape attempt in which no force was actually used is admissible if, on its facts, it presented a "threat" of violence. While in jail awaiting his capital penalty retrial, defendant Mason twice cut through the screen on his cell window. Each time, the cut was discovered before Mason could make good his escape. The prosecution showed that Mason's intended escape route, as well as any feasible alternative plan, would "almost certainly" have involved a confrontation with a guard. Under these circumstances, despite the lack of evidence that Mason was armed or

specifically intended violent resistance, we found there were sufficient indicia of potential violence to allow consideration of the attempted escape under factor (b). (52 Cal.3d at pp. 954-956.)

*Mason* did *not* hold, of course, that an escape "threat[ens]" violence, within the meaning of factor (b), *only* where the prosecution first demonstrates a specific likelihood that confrontation was probable in the particular case. Nor should such a rule be adopted. On the contrary, most, if not all, escapes from guarded confinement present indicia of potential violence similar to those we acknowledged in *Mason*. The "threat" or likelihood of violent confrontation is inherent in the breakout itself.[2]

Escape from a jail or prison is a desperate, risky act. It implies a reckless and defiant attitude of resistance to official restraint, which resistance carries the promise of violent consequences to those who interfere. Guards employed at such a secure facility have the direct responsibility to prevent any and all escapes, by force if necessary. Moreover, a successful escape, while it continues, represents a particular danger to public safety, and it also constitutes a direct and disturbing affront to the state's power and ability to maintain its lawful custody. Hence, an escape will almost certainly produce an intense and focused law enforcement effort to recapture the fugitive, again by all reasonable means including force. The likelihood of such a confrontation is sufficient to constitute "an express or implied threat [of] force or violence" which may be shown under factor (b). (See *People* v. *Mason, supra,* 52 Cal.3d at pp. 955-956.)

As *Boyd* itself indicated, the statutory exclusion of "nonviolent" crimes, except those evidenced by "prior" felony convictions, is intended "to prevent the jury from hearing evidence of conduct which, although criminal, is not of a type which should influence a life or death decision." (*People* v. *Boyd, supra,* 38 Cal.3d 762, 776.) However, it is difficult to argue that one or more jailbreaks by a dangerous capital felon fall into the category of "nonviolent" conduct irrelevant to penalty.

[2] In *People* v. *Lopez* (1971) 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372], we declined to find the crime of escape to be *"inherently* dangerous to human life" for purposes of the second degree felony-murder rule. (*Id.* at p. 52, italics added.) But as we explained in *Mason*, this reasoning "is not applicable to determinations under section 190.3, factor (b). Whether a felony is inherently dangerous for purposes of the second degree felony-murder rule is determined by viewing the *elements* of the felony in the abstract. [Citations.] In contrast, whether a particular instance of criminal activity 'involved . . . the express or implied threat to use force or violence' (§ 190.3, factor (b)) can only be determined by looking to the facts of the particular case." (*People* v. *Mason, supra,* 52 Cal.3d at p. 955, italics added.) Nothing in *Lopez* or *Mason* precludes the commonsense conclusion that the facts of a breakout from a secure jail or prison will most often involve the "express or implied threat" of force or violence under factor (b). Indeed, by rejecting the "not inherently dangerous" rationale of *Lopez* for capital sentencing purposes, *Mason* implicitly supports such a view.

Indeed, the threat of violence represented by the defendant's breakout from a secure facility is particularly pertinent to an individualized determination of the appropriate penalty in a capital case. Such conduct in the defendant's past raises the inference that, with nothing further to lose, he would pose such a risk in the future if sentenced to life without possibility of parole. Under these circumstances, it seems unlikely that the drafters and adopters of the death penalty law intended to allow consideration of such an episode only if specific indicia of violence were proved or if the escape was evidenced by a felony conviction obtained before commission of the capital crime. (See § 190.3, factor (c); *People* v. *Balderas* (1985) 41 Cal.3d 144, 203 [222 Cal.Rptr. 184, 711 P.2d 480].)

Cases may arise in which the circumstances of an escape clearly demonstrate no threat of violence. (Cf. *People* v. *Lopez, supra,* 6 Cal.3d 45, 51-52.) Nothing should prevent the defendant from showing that his escape, unlike most, was truly nonviolent. But in the capital sentencing context, the presumptions are otherwise in my view, particularly where the *admissibility of evidence* is concerned. Just as factor (b) does not require that violence actually materialized during an escape, so the statute does not contemplate subtle debates about *how likely* such violence may have been under the fortuitous circumstances of a particular case. By its nature, escape from a secure facility presumes a danger of confrontational violence within the purview of factor (b).

The facts of this defendant's Oregon escape illustrate many of the factors that make escapes in general so potentially dangerous. Moreover, even when viewed in isolation, the Oregon incident demonstrates a specific threat of violence analogous to that we found sufficient in *Mason.*

At the time of the Oregon escape, defendant was already a fugitive from capital charges in California, and he had recently used force against a jail guard to escape from California custody while awaiting trial for the capital offense. His confinement in Oregon stemmed from charges that he had subsequently committed a further violent felony in that state. These facts give rise to a logical inference that defendant was desperate to avoid punishment for his multiple serious crimes and would use force or violence to accomplish his goal. (Cf. *People* v. *Ewoldt* (1994) 7 Cal.4th 380, 402 [27 Cal.Rptr.2d 646, 867 P.2d 757] [prior conduct as evidence of criminal mental state on similar subsequent occasion].)

The circumstances of the escape itself also demonstrate the threat of violence. Tim Baker, a Jackson County, Oregon, sheriff's deputy, testified that defendant and another inmate forcibly dislodged the solid-oak backrest

of their cell bench from its metal backing. The men then used this four-foot piece of four-by-six-inch oak to punch a hole in a plate glass window leading to the exterior of the county jail building, which is located at an intersection "almost dead center" in the City of Medford.

Both escapees were considered dangerous, and the police departments of Medford and Ashland, Oregon were immediately alerted, as were businesses along the interstate 5 corridor between Medford and Ashland. A manhunt involving several police agencies began. Responding to a tip, Kenneth Savage, an Ashland patrol officer, observed the fugitives enter a taxicab at an Ashland gasoline station and followed as the cab proceeded onto the freeway. After backup units joined the pursuit, the police apprehended the cab by means of a "felony stop," with guns drawn. While the driver of the cab was being "secured," defendant tried to get out of the vehicle. Savage told him to get back in the car and keep his hands where Savage could see them. Defendant was ultimately removed from the cab and taken into custody.

Thus, the specific potential for violence was present throughout the episode. The method of escape, requiring extraordinary strength and effort, suggests a dangerous determination to gain freedom.[3] Moreover, even if no guard observed the escape itself, the jail's central urban location made it likely that the fugitives would be seen as they crawled through the window, that law enforcement response would be immediate, and that innocent civilians might also become pawns in the escapees' efforts to reach safety.

Of course, the authorities did react promptly, and the fugitives were soon located and captured by force. Thus here, unlike *Mason, supra,* there is no need to hypothesize the mere *probability* of a potentially dangerous confrontation between the escapee and those charged with restraining or recapturing him. Such a confrontation *actually occurred* when the manhunt for defendant and his partner ended with their apprehension by the police. That defendant "did not resist" when faced with overwhelming armed force hardly negates the inference that the "threat" of violence was present.

Accordingly, I am persuaded that admission of the Oregon escape evidence was proper under factor (b) of section 190.3. For this additional

---

[3]Deputy Baker testified that the wooden backrest on the cell bench was affixed to its metal backing by lag bolts, and that it appeared the backrest had been dislodged by physical force. The backrest was then used to "batter" a hole in a window made of quarter-inch laminated safety glass, and presumably designed with the security of inmates in mind.

reason, I, like the majority, reject defendant's contention that introduction of this evidence over his objection warrants reversal of the penalty judgment.[4]

George, C. J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied November 13, 1996.

---

[4]Defendant claims he was prejudiced by the court's "erroneous" instruction that in order to find the *criminal offense* of *forcible escape* (see § 4532, subd. (a)), the jury must conclude defendant had obtained his freedom by "force or violence," which could include "the application of physical force against property." In defendant's view, this instruction suggested, contrary to *Boyd, supra,* that force against property was enough to make an escape "violent" within the meaning of factor (b). No prejudicial error occurred. Whether or not the instruction correctly defined the elements of the crime of forcible escape (see *People v. Lozano* (1987) 192 Cal.App.3d 618, 626-628, & fn. 8 [237 Cal.Rptr. 612]; CALJIC No. 7.31), it merely specified that the jury must find all the elements of that offense before it could consider the violent aspects of defendant's conduct under factor (b). (See *People v. Boyd, supra,* 38 Cal.3d 762, 778.) No implication arose that force against property alone met *factor (b)*'s separate definition of actual or threatened "force or violence." The prosecutor did not argue that defendant's destruction of property during the Oregon escape was itself aggravating "violence" which weighed in favor of the death penalty. As we have seen, defendant was clearly guilty of at least the offense of "simple" escape, committed under circumstances implying a high degree of potential danger to human beings. Moreover, the general balance of aggravating over mitigating evidence was great. Under these circumstances, it is not reasonably possible that more precise instructions about the legal effect of property damage in the Oregon escape would have affected the penalty outcome. (See *People v. Brown* (1988) 46 Cal.3d 432, 446-449 [250 Cal.Rptr. 604, 758 P.2d 1135].)